KEVIN G. DUBAY, CONSERVATOR (ESTATE OF
ELIZABETH IRISH) *v.* INASITA IRISH
(13239)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued February 3—decision released May 17, 1988

*Rebecca B. Lamont,* with whom, on the brief, was *Steven L. Seligman,* for the appellant (plaintiff).

*Mark V. Connolly,* with whom was *James G. Kenefick, Jr.,* for the appellee (defendant).

CALLAHAN, J. The plaintiff, Kevin G. Dubay, as conservator of the estate of Elizabeth Irish, filed the instant appeal from the judgment of the trial court, *Noren, J.,* rendered in favor of the defendant, Inasita Irish, the mother of the plaintiff's incompetent. The trial court granted the defendant's motion for summary judgment, ruling that the first count of the plaintiff's amended complaint, sounding in negligence, was barred by the doctrine of parental immunity, and that the second count, sounding in wilful, wanton and/or reckless conduct, was barred by the statute of limitations. On appeal, the plaintiff raises the following issues: (1) whether the parental immunity doctrine bars the maintenance of a tort action against a parent by an unemancipated child who comes of age prior to filing the action; (2) whether the doctrine of parental immunity is a bar in a case where a parent is covered by liability insurance; (3) whether the parental immunity

doctrine violates article first, §§ 10 and 20 of the Connecticut constitution; and (4) whether the allegations of wilful, wanton and/or reckless conduct set forth in the second count of the amended complaint assert a new cause of action so as to be barred by the statute of limitations. We find no error.

The relevant facts are not in dispute. On March 11, 1983, Elizabeth Irish (hereinafter Elizabeth), the seventeen and one-half year old daughter of the defendant, stayed home from school complaining of an upset stomach. Prior to leaving for work that day, the defendant looked in on Elizabeth and found her sleeping. Thereafter, the defendant went to work and afterward did her grocery shopping before returning home at approximately 8 p.m. Elizabeth greeted the defendant on her return and took a container of yogurt from the groceries the defendant had purchased. Subsequently, Elizabeth refused to eat her dinner and at approximately 9:15 p.m., the defendant heard her daughter vomiting. While attempting to render aid, the defendant learned that Elizabeth had ingested a large number of pills of assorted prescription medications. The medications had been prescribed to the defendant for her asthma, high blood pressure, muscle spasms and back pains. In an attempt to induce her to eject the pills from her stomach, the defendant and another of her daughters placed Elizabeth in a shower and forced her to drink coffee. Those efforts having proved futile, at approximately 1 a.m., the defendant took Elizabeth, who was conscious and coherent, to Mount Sinai Hospital. About four hours elapsed between the time the defendant first discovered Elizabeth had ingested medication and was ill and the time the defendant took Elizabeth to the hospital.

While at Mount Sinai Hospital, Elizabeth began to experience convulsions and, subsequently, went into a coma. Thereafter, she remained unresponsive to stimuli

for two weeks and was required to be maintained on a respirator for six days. As an apparent result of the drug ingestion, Elizabeth suffers from organic brain damage with a significant degree of mental retardation.[1]

The medications taken by Elizabeth had been kept by the defendant in their individual containers inside a plastic bag in a cabinet above a broom closet in the kitchen. The defendant had moved the medications to the kitchen cabinet from a dresser near her bed approximately six weeks before the incident in question because she was concerned that her prescriptions were "too exposed to everyone," including her young grandchildren and Elizabeth. The defendant testified that she could reach her medications in the kitchen cabinet only with the aid of a step stool.

After having been appointed Elizabeth's conservator on February 19, 1985, the plaintiff filed this action on February 22, 1985, by which time Elizabeth had reached the age of eighteen. The original single count complaint alleged that the defendant had negligently and carelessly caused Elizabeth to suffer organic brain damage and to become mentally retarded in that: "(a) she maintained within the family premises large quantities of dangerous drugs, when she knew or should have known of the Plaintiff's Incapable's suicidal tendencies and of the likelihood that the Plaintiff's Incapable would consume said drugs;[2] (b) she failed to hide

---

[1] The record reveals that, in the two years before she had ingested the medications, Elizabeth had been experiencing emotional or psychiatric problems and had attempted suicide on at least one occasion. The record is not clear, and the parties have not raised the issue, as to whether her prior psychiatric illness is in any way related to her present brain damaged condition.

[2] In the weeks immediately preceding March 11, 1983, Elizabeth appeared to be very happy and had been doing well in school, attending church dances and going to the movies. The defendant indicated that, during this time, she saw no indications that Elizabeth desired to take her own life, and that Elizabeth had never before tampered with the defendant's prescription medications.

or secure from the Plaintiff's Incapable aforesaid dangerous drugs, when she knew or should have known of the Plaintiff's Incapable's likelihood to consume them; (c) she failed to warn or otherwise instruct the Plaintiff's Incapable not to consume said drugs; and (d) she failed to determine in a prompt and timely fashion that the Plaintiff's Incapable had consumed said drugs and failed, therefore, to obtain for her prompt and timely medical care." The defendant moved to strike the original complaint on the ground that the action was barred by the doctrine of parental immunity. The trial court, *Purtill, J.,* agreed and granted the defendant's motion to strike. Thereafter, the plaintiff filed the present two count amended complaint sounding in negligence and wilful, reckless and/or wanton conduct.[3] The defendant then moved for summary judgment and argued that the first count was barred by the doctrine of parental immunity, and that the second count was barred by the statute of limitations because it set forth a new cause of action, filed more than two years after the incident, which did not relate back to the filing of the initial complaint. In the alternative, the defendant argued that, even if it were assumed that the second count related back to the original complaint and was timely, the plaintiff had presented no facts or evidence to demonstrate that the defendant's conduct was wilful, wanton and/or reckless. The trial court, *Noren, J.,* granted the defendant's motion for summary judgment and rendered judgment thereon for the defendant. We find no error.

I

The first claim raised by the plaintiff is that the doctrine of parental immunity bars the initiation of suit

---

[3] The first count of the amended complaint is identical to the single count complaint previously stricken by the trial court. The second count also contains the same factual allegations as count one and further alleges that the defendant's conduct was "wilful, wanton, and/or reckless."

by only an unemancipated minor, and thus, the doctrine is not applicable here because Elizabeth had become emancipated prior to the filing of this action. We disagree.

The parental immunity doctrine bars an unemancipated minor from suing his or her parent for injuries caused by the negligence of that parent. *Dzenutis* v. *Dzenutis,* 200 Conn. 290, 293, 512 A.2d 130 (1986); *Ooms* v. *Ooms,* 164 Conn. 48, 51, 316 A.2d 783 (1972). Under this doctrine "a parent is not liable civilly to his child for personal *injury inflicted during [the child's] minority* . . . ." (Emphasis added.) *Mesite* v. *Kirchenstein,* 109 Conn. 77, 82–83, 145 A. 753 (1929). Thus, to determine the applicability of the parental immunity doctrine, the age of the child at the time the injury is inflicted governs and not the age of the child at the time the action is filed. "Contrary to the contention of the plaintiff, her emancipation subsequent to her injury gives her no additional right to maintain this action. Her right to sue must exist at the time of the injury and her subsequent emancipation is of no consequence. 'An emancipated child cannot maintain an action against his parent for a tort committed before emancipation if at the time of the wrong the action was not maintainable.' 59 Am. Jur. 2d, Parent and Child, § 157. . . ." *Lee* v. *Comer,* 159 W. Va. 585, 587–88, 224 S.E.2d 721 (1976); see also *London Guarantee & Accident Co.* v. *Smith,* 242 Minn. 211, 214 n.2, 64 N.W.2d 781 (1954); *Franco* v. *Davis,* 51 N.J. 237, 238, 239 A.2d 1 (1968), rev'd in part on other grounds, *France* v. *A.P.A. Transport Corporation,* 56 N.J. 500, 267 A.2d 490 (1970).

There is no dispute that, at the time of her injuries, Elizabeth was the seventeen and one-half year old unemancipated child of the defendant. Her subsequent emancipation prior to the filing of this action had no

effect on the applicability of the parental immunity doctrine. The trial court did not err in so holding.

## II

The plaintiff next claims that the parental immunity doctrine should not bar a minor's negligence action against a parent where, as here, the parent is covered by liability insurance. The plaintiff argues that the parental immunity doctrine no longer serves the interests of family harmony and is an impediment to the utilization of the very resources that would help the family, i.e., insurance proceeds. The plaintiff relies solely upon the recent case of *Dzenutis* v. *Dzenutis*, supra, to support his position. We disagree.

In *Dzenutis*, we had occasion to address the applicability of the parental immunity doctrine in the limited context of an unemancipated minor who had sustained injuries away from the family environment and by reason of the negligently conducted business activities of his parent. Id., 299–300. While this court sustained the trial court's refusal to apply the parental immunity doctrine in that case, we also specifically disagreed "with the trial court's view that the presence of insurance should be the touchstone of viability of an action by a child against a parent and that recovery should be limited to the insurance policy." Id., 299. We went on to note the following: "In *Shaker* [v. *Shaker*, 129 Conn. 518, 523–24, 29 A.2d 765 (1942)], we rejected the claim that the outcome of a case should depend upon whether the defendant has insurance. We continue to believe that different rules of law should not be fashioned for the insured and the uninsured. We note that the legislature has made no such differentiation in the enactment of § 52-572c, which abrogates the immunity for motor vehicle, aircraft and boat accidents without regard to whether there may be insurance coverage. It would be inconsistent with the legislative scheme to

make the applicability of parent-child immunity depend upon the availability of insurance in an individual case." Id.; see also *Villaret* v. *Villaret,* 169 F.2d 677, 678–79 (D.C. Cir. 1948); *Mathis* v. *Ammons,* 453 F. Sup. 1033, 1035 (E.D. Tenn. 1978); *Rambo* v. *Rambo,* 195 Ark. 832, 838–39, 114 S.W.2d 468 (1938); *Rousey* v. *Rousey,* 528 A.2d 416, 421 (D.C. App. 1987); *Cosmopolitan National Bank* v. *Heap,* 128 Ill. App. 2d 165, 168, 262 N.E.2d 826 (1970); *Stevens* v. *Murphy,* 69 Wash. 2d 939, 948, 421 P.2d 668 (1966), rev'd on other grounds, *Merrick* v. *Sutterlin,* 93 Wash. 2d 411, 416, 610 P.2d 891 (1980). Clearly, our holding in *Dzenutis* does not support the plaintiff's claim that the parental immunity doctrine serves no purpose in cases where liability insurance exists.

We also find *Dzenutis* inapplicable here for another significant reason. In *Dzenutis,* the alleged acts of negligence were committed by the parent away from the home and in the context of the parent's business activities. *Dzenutis* v. *Dzenutis,* supra, 300. In the case at hand, the alleged acts of negligence occurred within the family home and clearly involved the exercise of ordinary parental discretion and control with respect to the care, supervision and instruction of Elizabeth.[4] In factually similar cases, a number of jurisdictions in other states have specifically declined to abrogate parental immunity notwithstanding the availability of liability insurance. See *Schneider* v. *Coe,* 405 A.2d 682, 684–85 (Del. 1979) (child wandered off and was injured when a parent allowed child to stand unattended at the top of the stairway leading to the exit of the building); *Cosmopolitan National Bank* v. *Heap,* supra, 169 (child

---

[4] "A parent's exercise of authority over his or her child involves more than discipline. It includes the providing of instruction and education so that a child may be aware of dangers to his or her well being." *Paige* v. *Bing Construction Co.,* 61 Mich. App. 480, 484, 233 N.W.2d 46 (1975); see also *Haddrill* v. *Damon,* 149 Mich. App. 702, 706–707, 386 N.W.2d 643 (1986).

injured when he slipped on a loose fitting stairway rug that the father failed to secure); *Frye* v. *Frye,* 305 Md. 542, 564–65, 567, 505 A.2d 826 (1986); *Addiego* v. *Interboro General Hospital,* 81 Misc. 2d 96, 365 N.Y.S.2d 718 (1975) (child ingested a caustic substance that was placed in a glass on the floor at the parent's side while the parent attempted to free a clogged bathtub drain); *Sixkiller* v. *Summers,* 680 P.2d 360, 362 (Okla. 1984) (child was injured as a result of father's alleged failure to supervise and instruct child on dangers of a bow and arrows and by father's failure to place bow and arrows in safe place); *Talarico* v. *Foremost Ins. Co.,* 105 Wash. 2d 114, 116, 712 P.2d 294 (1986) (child injured when parent left him unattended in his backyard with an open fire burning). Even in those jurisdictions that have, in part, abrogated parental immunity on the basis of, inter alia, the existence of insurance, the overwhelming majority of them have specifically retained the doctrine in the area of parental supervision, or have at least recognized that the doctrine may have continued validity where the negligent act involves the exercise of ordinary parental discretion with respect to the care and control of a minor child.[5] In fact, although the American Law Institute rejected the parental immunity doctrine generally in 1977, today it continues to recognize the validity of the doctrine in situations where the alleged negligent conduct involves the exercise of parental authority or supervision. 4 Restatement (Second), Torts § 895G, comment k (1979).

[5] See *Hebel* v. *Hebel,* 435 P.2d 8, 14 (Alaska 1967); *Sandoval* v. *Sandoval,* 128 Ariz. 11, 13–14, 623 P.2d 800 (1981); *Schneider* v. *Coe,* 405 A.2d 682, 684–85 (Del. 1979); *Pedigo* v. *Rowley,* 101 Idaho 201, 205, 610 P.2d 560 (1980); *Cosmopolitan National Bank* v. *Heap,* 128 Ill. App. 2d 165, 169–70, 262 N.E.2d 826 (1970); *Turner* v. *Turner,* 304 N.W.2d 786, 788–89 (Iowa 1981); *Nocktonick* v. *Nocktonick,* 227 Kan. 758, 769–70, 611 P.2d 135 (1980); *Rigdon* v. *Rigdon,* 465 S.W.2d 921, 923 (Ky. 1971); *Black* v. *Solmitz,* 409 A.2d 634, 639 (Me. 1979); *Sorensen* v. *Sorensen,* 369 Mass. 350, 366, 339 N.E.2d 907 (1975); *Haddrill* v. *Damon,* 149 Mich. App. 702, 706–707, 386

The supervision, care and instruction of one's child involves issues of parental control, authority and discretion that are uniquely matters of a very personal type. *Schneider* v. *Coe,* supra, 684. "Each parent has unique and inimitable methods and attitudes on how children should be supervised. Likewise, each child requires individualized guidance depending on intuitive concerns which only a parent can understand. Also, different cultural, educational and financial conditions affect the manner in which different parents supervise their children. Allowing a cause of action for negligent supervision would enable others, ignorant of a case's peculiar familial distinctions and bereft of any standards, to second-guess a parent's management of family affairs . . . ." *Paige* v. *Bing Construction Co.,* 61 Mich. App. 480, 485, 233 N.W.2d 46 (1975); see also *Cherry* v. *Cherry,* 295 Minn. 93, 95, 203 N.W.2d 352 (1972).

Accordingly, we decline to abrogate the doctrine of parental immunity in cases, such as this, involving allegations of the negligent exercise of parental discretion with regard to the care, supervision and instruction of a child based solely upon the existence of liability insurance. Courts should not unnecessarily involve themselves in the day-to-day exercise of parental discretion regarding the upbringing and care of children. To do so would undermine parental authority in the very personal endeavor of child rearing and inject the machin-

N.W.2d 643 (1986); *Cherry* v. *Cherry,* 295 Minn. 93, 95, 203 N.W.2d 352 (1972); *Transamerica Ins. Co.* v. *Royle,* 202 Mont. 173, 180, 656 P.2d 820 (1983); *Foldi* v. *Jeffries,* 93 N.J. 533, 545–46, 461 A.2d 1145 (1983); *Holodook* v. *Spencer,* 36 N.Y.2d 35, 45–51, 324 N.E.2d 338, 364 N.Y.S.2d 859 (1974); *Addiego* v. *Interboro General Hospital,* 81 Misc. 2d 96, 98–99, 365 N.Y.S.2d 718 (1975); *Sixkiller* v. *Summers,* 680 P.2d 360, 362 (Okla. 1984); *Silva* v. *Silva,* 446 A.2d 1013, 1016–17 (R.I. 1982); *Felderhoff* v. *Felderhoff,* 473 S.W.2d 928, 933 (Tex. 1971); *Wright* v. *Wright,* 213 Va. 177, 179, 191 S.E.2d 223 (1972); *Talarico* v. *Foremost Ins. Co.,* 105 Wash. 2d 114, 116–17, 712 P.2d 294 (1986); *Goller* v. *White,* 20 Wis. 2d 402, 413, 122 N.W.2d 193 (1963).

ery of the state into an area where its presence might be the occasion for family discord. The trial court, therefore, did not err in granting the motion for summary judgment on the negligence count of the plaintiff's complaint.

## III

### A

The plaintiff next claims that the parental immunity doctrine violates the equal protection clause of article first, § 20, of the Connecticut constitution. Specifically, the plaintiff argues that, with the abrogation of virtually all other forms of intrafamilial immunity, unemancipated children are placed in a classification that is not based upon any natural or substantial differences germane to the subject and purposes of the rule.

At the outset, we note that the plaintiff did not raise the equal protection claim below in opposition to either the defendant's motion to strike or the defendant's motion for summary judgment. Therefore, the issue was never properly briefed nor presented to the trial court for a decision as required by Practice Book § 4185. In addition, the plaintiff bears the heavy burden of demonstrating that, under the particular facts of this case, the parental immunity doctrine violates Elizabeth's constitutional rights. See *State* v. *Zach,* 198 Conn. 168, 176, 502 A.2d 896 (1985). The plaintiff has, however, failed to cite any authority whatsoever wherein the doctrine of parental immunity has been held to be violative of either the state or federal equal protection clauses. Accordingly, we decline to review the plaintiff's equal protection claim because he has failed to demonstrate a clear deprivation of a fundamental constitutional right. *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

## B

The plaintiff also claims that the parental immunity doctrine deprives Elizabeth of her right to redress for her injuries as guaranteed by article first, § 10, of the Connecticut constitution. We disagree.

Article first, § 10, provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Section 10 "has been viewed as a limitation upon the legislature's ability to abolish common law and statutory rights that existed in 1818, when article first, § 10 was adopted, and which were 'incorporated in that provision by virtue of being established by law as rights the breach of which precipitates a recognized injury . . . .' *Gentile* v. *Altermatt,* 169 Conn. 267, 286, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); see also *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 585, 512 A.2d 893 (1986); *Warner* v. *Leslie-Elliott Constructors, Inc.,* 194 Conn. 129, 133 n.3, 479 A.2d 231 (1984)." *Ecker* v. *West Hartford,* 205 Conn. 219, 234, 530 A.2d 1056 (1987). Thus, it is clear that § 10 is implicated only where a right that existed at common law or by statute prior to 1818 has been infringed upon or abolished.

The plaintiff has presented no authority to support the proposition that prior to 1818 a child had a right, guaranteed either by statute or common law, to maintain a tort action against a parent; nor has this court been able to find any. Case law, in fact, tends to support a contrary view. Careful research of the early authorities has failed to disclose a single case prior to 1818 in this country or England involving a personal tort action between a child and a parent. See *Gibson*

v. *Gibson,* 3 Cal. 3d 914, 916, 479 P.2d 648, 92 Cal. Rptr. 288 (1971); *Sorensen* v. *Sorensen,* 369 Mass. 350, 353, 339 N.E.2d 907 (1975); *Dunlap* v. *Dunlap,* 84 N.H. 352, 356, 150 A. 905 (1930); *Tucker* v. *Tucker,* 395 P.2d 67, 68 (Okla. 1964), rev'd on other grounds, *UNAH By and Through UNAH* v. *Martin,* 676 P.2d 1366 (Okla. 1984). The first reported case to address the issue appears to be the Mississippi Supreme Court case of *Hewlett* v. *George,* 68 Miss. 703, 9 So. 885 (1891). In *Hewlett* v. *George,* supra, 711, the parental immunity doctrine was first *articulated* as follows: "But so long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrong-doing, and this is all the child can be heard to demand." See *Ard* v. *Ard,* 414 So. 2d 1066, 1067 (Fla. 1982); *Rupert* v. *Stienne,* 90 Nev. 397, 405, 528 P.2d 1013 (1974); *Tucker* v. *Tucker,* supra.

We conclude that the plaintiff has failed in his burden to prove that a child had either a statutory or a common law right of action in tort against a parent prior to 1818 when the Connecticut constitution was adopted. *Zapata* v. *Burns,* 207 Conn. 496, 515–16, 542 A.2d 700 (1988). Consequently, contrary to his unsupported claim, we find that the trial court did not err in holding that the plaintiff failed to demonstrate that the doctrine of parental immunity as applied in this case violated article first, § 10, of the Connecticut constitution.

IV

The plaintiff's final claim is that the second count of his amended complaint sounding in wilful, wanton and/or reckless conduct is not barred by the statute of limitations because it does not state a new cause of action different from the negligence count set forth in his original complaint. He argues that the second count of the amended complaint relates back to the filing of the original complaint and is therefore not time barred.

Under the circumstances of this case, we decline to address the specific question of whether the second count of the plaintiff's amended complaint alleging wilful, wanton and/or reckless conduct states a new and different cause of action than the original complaint that sounded only in negligence.[6] Even if we assume that the second count related back to the filing of the

---

[6] We recognize that a number of our prior decisions have stated generally that "[i]t is well established that causes of action for negligence and 'wilful or malicious conduct' are separate and distinct causes of action." *Warner* v. *Leslie-Elliott Constructors, Inc.*, 194 Conn. 129, 138, 479 A.2d 231 (1984); see also *Dumond* v. *Denehy*, 145 Conn. 88, 91, 139 A.2d 58 (1958); *Brock* v. *Waldron*, 127 Conn. 79, 80, 14 A.2d 713 (1940). Although we need not address this issue, we question the applicability of the proposition here because none of the cases cited involved a relation back claim for purposes of the statute of limitations raised in connection with an amendment to a complaint. In addition, the plaintiff here relies upon the identical factual allegations in both the negligence and the wilful, wanton and/or reckless counts of the amended complaint. Further, the issue has been specifically addressed in other jurisdictions that have held an amendment to a complaint setting forth an additional count, one that sounds in wilful, wanton and/or reckless conduct, to the existing negligence count did not state a new and distinct cause of action and, therefore, related back to the filing of the original complaint for purposes of the statute of limitations. See *Saari* v. *Superior Court*, 178 Cal. App. 2d 175, 178–79, 2 Cal. Rptr. 856 (1960); *Barr* v. *Carroll*, 128 Cal. App. 2d 23, 34, 274 P.2d 717 (1959); *Harbert* v. *Kansas City Elevated R. Co.*, 91 Kan. 605, 610, 138 P. 641 (1914); *Kizer* v. *Bowman*, 256 N.C. 565, 570, 124 S.E.2d 543 (1962); *Bush* v. *Kelley's, Inc.*, 18 Ohio St. 2d 89, 93, 247 N.E.2d 745 (1969); *Cohen* v. *Bucey*, 158 Ohio St. 159, 168, 107 N.E.2d 333 (1952).

original complaint for purposes of the application of the statute of limitations, we would, nevertheless, affirm the trial court's entry of summary judgment for the defendant because the plaintiff has presented no factual allegations or evidence to raise even a suspicion that the defendant's conduct was wilful, wanton or reckless.[7]

"Recklessness is a state of consciousness with reference to the consequences of one's acts. *Commonwealth v. Pierce,* 138 Mass. 165, 175 [1884]. . . . It is 'more than negligence, more than gross negligence.' *Bordonaro v. Senk,* 109 Conn. 428, 431, 147 Atl. 136 [1929]. The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." *Mooney v. Wabrek,* 129 Conn. 302, 308, 27 A.2d 631 (1942). "Wanton misconduct is reckless misconduct. *Menzie v. Kalmonowitz,* 107 Conn. 197, 199, 139 A. 698 (1928). 'It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action.' *Bordonaro v. Senk,* [supra, 431]." *Markey v. Santangelo,* 195 Conn. 76, 78,

---

[7] The plaintiff's claim assumes that the parental immunity doctrine is not a bar to a child's action against a parent based upon the parent's wilful, wanton and/or reckless conduct. Although this court has not specifically addressed the issue, language from early decisions of this court indicates to the contrary. In *Shaker v. Shaker,* 129 Conn. 518, 523, 29 A.2d 765 (1942), and *Mesite v. Kuchenstein,* 109 Conn. 77, 86, 145 A. 753 (1929), the court stated: "Considering the situation of the child in its broadest aspects . . . the rule of the courts, that the maintenance of an action of tort by a child against his parent for injuries suffered through the negligent, wilful or wanton conduct of the parent is against sound public policy, cannot be held to be so unwise as to make necessary our departure from it at this late date." A growing number of jurisdictions have exempted the wilful, wanton and/or reckless misconduct of a parent from the doctrine of parental immunity. We need not, however, address that issue in light of our holding herein. In addition, neither party has raised or briefed the issue.

485 A.2d 1305 (1985); see also *Brown* v. *Branford,* 12 Conn. App. 106, 108, 529 A.2d 743 (1987). Wilful misconduct has been defined as intentional conduct designed to injure for which there is no just cause or excuse. *Markey* v. *Santangelo,* supra, 77. " '[Its] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances.' *Sharkey* v. *Skilton,* 83 Conn. 503, 507–508, 77 A. 950 (1910)." Id., 78. Not only the action producing the injury but the resulting injury also must be intentional. Id., 77.

While we have attempted to draw definitional distinctions between the terms wilful, wanton or reckless, in practice the three terms have been treated as meaning the same thing.[8] "The result is that 'willful,' 'wanton,' or 'reckless' conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. . . . It is at least clear . . . that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention . . . ." W. Prosser & W. Keeton, Torts (5th Ed.) § 34, p. 214.

During oral argument before this court, the plaintiff limited his claim of wilful, wanton and/or reckless conduct to the fact that the defendant had delayed almost four hours before taking Elizabeth to the hospital. While the record before this court establishes the existence of such a delay, the plaintiff ignores the fact that it also establishes that the defendant took prompt action upon discovering that Elizabeth had swallowed the pills.

---

[8] " 'Wilful misconduct is intentional misconduct, and wanton misconduct is reckless misconduct, which is the equivalent of wilful misconduct.' " *State* v. *Alterio,* 154 Conn. 23, 25–26, 220 A.2d 451 (1966); see also *Menzie* v. *Kalmonowitz,* 107 Conn. 197, 199, 139 A. 698 (1928).

When the defendant first heard Elizabeth vomiting, she went to her aid and attempted to discern what was wrong. Elizabeth, however, did not immediately reveal what she had done. Initially, the defendant thought that the cause of Elizabeth's discomfort was the yogurt she had eaten earlier, coupled with the stomachache that had precipitated her absence from school that day. Upon ascertaining that Elizabeth had ingested the medications, however, the defendant sought help from her other daughter and advice from her doctor and made preparations to take Elizabeth to the hospital. Elizabeth resisted, however, and refused to go. The defendant, therefore, as first aid, placed Elizabeth in a shower and forced her to drink coffee in an attempt to induce vomiting. Subsequently, Elizabeth requested that the defendant wait to see if she felt better before taking her to the hospital. Despite Elizabeth's requests to the contrary, however, the defendant finally insisted that Elizabeth obtain professional medical help and took her to Mount Sinai Hospital. Elizabeth was conscious, coherent, and apparently resistant the entire time. Accordingly, under the undisputed factual circumstances presented, we conclude that no genuine issue of material fact existed,[9] and that, as a matter of law, a fair and reasonable trier could not possibly determine that the defendant's conduct was wilful, wanton and/or reckless.[10] The trial court therefore reached the cor-

---

[9] The relevant facts were undisputed. The only evidence submitted by the parties in connection with the motion for summary judgment was the transcript of the defendant's deposition testimony. Neither party submitted any affidavits; therefore, no genuine issue of fact existed.

[10] The conclusion of negligence, although ordinarily a mixed question of law and fact, becomes strictly a question of law only when the mind of a fair and reasonable man could reach but one conclusion. *Parlato* v. *Connecticut Transit,* 181 Conn. 66, 68, 434 A.2d 322 (1980); *Smith* v. *Leuthner,* 156 Conn. 422, 424–25, 242 A.2d 728 (1968). Because wilful, wanton and/or reckless conduct are aggravated forms of negligence, we find the controlling principle of law set forth in these cases to be applicable here.

rect result when it granted the defendant's motion for summary judgment.[11]

There is no error.

In this opinion the other justices concurred.

---

[11] Where the trial court reached the correct result, its judgment can be affirmed regardless of the grounds upon which the judgment rests. See *State* v. *Vincent,* 194 Conn. 198, 204 n.8, 479 A.2d 237 (1984); *Glemboski* v. *Glemboski,* 184 Conn. 602, 606–607, 440 A.2d 242 (1981); *Cheshire* v. *McKenney,* 182 Conn. 253, 261, 438 A.2d 88 (1980).