# CHRISTOPHER BURGESS *v.* STATE OF CONNECTICUT

Superior Court, Judicial District of New Britain
File No. CV-03-0520679

# RICHARD PIOTROWSKI *v.* STATE OF CONNECTICUT

Superior Court, Judicial District of New Britain
File No. CV-03-0520681

Memorandum filed August 2, 2012

*Proceedings*

*Gary D. Constant* and *Stratton Faxon Trial Lawyers, LLC,* for the plaintiff Christopher Burgess.

*James F. Kane,* for the plaintiff Richard F. Piotrowski.

*Michael R. Bullers,* assistant attorney general, for the defendant.

HON. JOSEPH M. SHORTALL, JUDGE TRIAL REFEREE. Late on the night of June 10, 1994, Christopher Burgess and Richard Piotrowski (plaintiffs), longtime friends who had just finished their first year at college, were spending the evening drinking beer and catching up with each other and other friends first at Pinnacle Mountain and later at Sunset Rock State Park (Sunset Rock), both located in Plainville.[1] At approximately 10:45 p.m. Mr. Burgess accidentally stepped over the edge of the steep cliff which forms the western boundary of Sunset Rock and fell about seventy-five feet down the cliff. Shortly thereafter, Mr. Piotrowski, in a brave and foolish attempt to climb down the cliff and aid Mr. Burgess, also fell.

In this action the plaintiffs seek compensation from the state of Connecticut for the injuries they suffered. They allege that the state acted not only negligently but also wilfully and maliciously in failing to take measures to safeguard visitors to Sunset Rock from the hazard posed by the cliff; e.g., posting adequate warning signs,

---

[1] Mr. Burgess was smoking marijuana as well.

lighting the park after dark, trimming back vegetation obscuring the cliff's edge, and repairing the fence between Ledge Road, which forms the eastern boundary of the park, and the cliff.[2] The state denies that it was negligent or acted wilfully or maliciously in its management of Sunset Rock. Moreover, it claims by way of special defenses that (1) it is immune from liability pursuant to General Statutes § 52-557g, the recreational land use immunity statute, and (2) the injuries suffered by the plaintiffs were caused by their own negligence.[3]

The liability issues raised by the parties were tried to this court on June 19, 21 and 22 of 2012.[4] This memorandum of decision sets out the court's findings of the material facts, based on its assessment of the credibility of the witnesses and the weight to be accorded their testimony, as well as the exhibits that were introduced and the court's conclusions of law on the issues argued by the parties at trial and in their posttrial submissions.

I

Sunset Rock was deeded to the state "for state park purposes for the perpetual use and enjoyment of the people of Connecticut"; exhibit 24; by the Sunset Rock

---

[2] Claims by both plaintiffs that the state's action and inaction had created a nuisance were dismissed by the court (*Schuman*, *J.*), which found that "there is no basis to conclude that the legislature waived the state's sovereign immunity for nuisance claims." *Burgess* v. *State*, judicial district of New Britain, Docket No. CV-03-0520679 (January 8, 2007), and *Piotrowski* v. *State*, Superior Court, judicial district of New Britain, Docket No. CV-03-0520681 (January 8, 2007).

[3] This action was not commenced until April, 2003, after the claims commissioner had denied the plaintiffs permission to sue the state and the General Assembly had passed a special act in 2002 rejecting his recommendation and authorizing suit. Thereafter, the case seems to have languished on the court's docket until the pleadings were closed in 2010 and the case was assigned for trial.

[4] The court (*Pittman*, *J.*) had ordered that the trial of the liability and damages issues be bifurcated.

Association (association) in October, 1928. It contains 13.6 acres "more or less"; id.; bounded on the east by what is now known as Ledge Road[5] and on the west by the cliff. It consists of a heavily wooded strip of land running approximately 500 feet along Ledge Road. It is maintained by the state department of energy and environmental protection (DEEP), known in June, 1994, as the department of environmental protection (DEP).

Members of the public have access to Sunset Rock directly from Ledge Road, and there are two "pull-off" areas where cars can be parked and from which persons can walk into Sunset Rock. The best evidence in the record of the distance between Ledge Road and the cliff is found in the report of the plaintiffs' expert witness, Brian Callagan, who states that the distance is less than seventy-five feet. Exhibit 11, p. 3. Intermittently along the length of Sunset Rock, a six foot high chain-link fence runs between Ledge Road and the cliff. The distance from the fence to the cliff varies and was no more than twenty feet at the point where the plaintiffs fell. The obvious purpose of the fence was to prevent access to the cliff edge, but access was possible by climbing over or walking around the ends of the fence. In addition, the fence was routinely breached by vandals and breached again after being repaired by state personnel, to the point that a well-worn path led from Ledge Road to the cliff area. On June 10, 1994, Mr. Burgess and Mr. Piotrowski gained access to the cliff area through a section of the fence that had been pulled down by vandals and left lying on the ground.

No fee was charged for access to Sunset Rock, and there were no public facilities or amenities there.

---

[5] Exhibit 24, the deed from the association to the state, identifies the eastern boundary as "a highway known as Crooked Street," but the parties agreed that the eastern boundary is now Ledge Road, and maps introduced into evidence indicate the same. See exhibit 20b.

Although not officially designated as a "scenic over-look" by the state, that was the principal use made of Sunset Rock, as it afforded an elevated platform to view Interstate 84 and the western part of the state. On a DEP map in evidence; exhibit 20a; it is designated a "scenic reserve." It was also regularly used by young people like the plaintiffs as a place for nocturnal meetings and beer drinking, a fact well known to the state from its regular cleanup activities at Sunset Rock.

Like all state parks, except those with campgrounds, Sunset Rock closed at sunset, and access thereafter was prohibited. There was a sign posted at Sunset Rock to this effect; its effectiveness as a warning, however, was less than it might have been, as it was attached to a tree about twelve feet off the ground and was invisible after dark. Although Mr. Burgess testified that he did not know the park was closed at sunset, Mr. Piotrowski acknowledged that he knew they should not have been there after dark. And, both plaintiffs had been told by Plainville police to leave the park after dark not long before this incident.

There was a sign attached to an intact portion of the fence through which the plaintiffs reached the cliff area, reading, "Warning Cliff Natural Hazard." Furthermore, both plaintiffs testified that they had been to the park numerous times before the night of June 10 and were well aware of the presence of the cliff.

## II

The state's first line of defense against the plaintiffs' claims is the immunity from liability conferred by § 52-557g (a) on owners of land available to the public for recreation: "[A]n owner of land who makes all or any part of the land available to the public without charge, rent, fee or other commercial service for recreational purposes owes no duty of care to keep the land, or the part thereof so made available, safe for entry or use by

others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on the land to persons entering for recreational purposes."[6] The threshold question in considering this defense is whether it is available to the state of Connecticut or is limited to private landholders who make their property available free of charge for recreational purposes. In *Conway* v. *Wilton*, 238 Conn. 653, 680 A.2d 242 (1996), the Supreme Court held that this grant of immunity is not available to municipalities, stating that "[t]he protection granted through the act was an incentive for private owners to open up new lands for public use. It was not an attempt to provide an immunity shield for existing state[7] or municipal recreational areas." (Internal quotation marks omitted.) Id., 674.

The plaintiffs argue that the rationale for denying this immunity to a municipality should apply equally to the state. In doing so, however, they fail to give sufficient consideration to another statute governing lawsuits like this one, where the state's sovereign immunity is abrogated by the grant of a right to sue the state for damages. General Statutes §§ 4-159 and 4-160 authorize actions against the state either upon a vote of the General Assembly; General Statutes § 4-159 (c); or with the approval of the claims commissioner. General Statutes § 4-160 (a). In both statutes the standard for allowing suit is the same; viz., when the General Assembly or

[6] Subsection (b) of § 52-557g makes explicit that the owner of such land who invites or permits the public to use the land for recreational purposes does not (1) make any representation that the premises are safe for any purpose, (2) confer upon the person invited the legal status of invitee or licensee to whom a duty of care is owed or (3) assume responsibility or liability for any injury to person or property caused by an act or omission of the owner.

[7] The reference to the availability of the statute as a defense for the state is dictum, inasmuch as the court was called upon only to decide whether or not the immunity was available to a municipality. Thus, it provides no authority for the plaintiffs' position.

the claims commissioner "believes the claim to present an issue of law or fact under which the state, were it a private person, could be liable." General Statutes § 4-159 (c). Section 4-160 (c) goes on to provide that, whether authorized by the General Assembly, as here, or the claims commissioner, "[t]he rights and liability of the state in each such action shall be coextensive with and shall equal the rights and liability of *private persons in like circumstances.*" (Emphasis added.)

Read together with § 52-557g, which grants immunity from suit to private persons who make their land available to the public without charge for recreational purposes, the plain meaning of § 4-160 (c) is that the state enjoys the same immunity as such a private person as long as it otherwise satisfies the requirements of the statute, i.e., as long as it makes land which it owns available for recreational purposes free of charge.

The plaintiffs see an inconsistency between the language of § 4-160 (c) quoted above and the sentence immediately preceding it in the statute: "The state waives its immunity from liability and from suit in each such action [where the General Assembly or the claims commissioner authorizes suit] and waives all defenses which might arise from the eleemosynary or governmental nature of the activity complained of. . . ." General Statutes § 4-160 (c). To the contrary, the court sees these two sentences as complementary and consistent. Read together, they drive home the point of the statutory scheme allowing suits against the state in cases presenting "an issue of law or fact under which the state, *were it a private person,* could be liable." (Emphasis added.) General Statutes §§ 4-159 (c) and 4-160 (a). In such cases the state is stripped of any of the defenses on which it could rely as a governmental entity[8] and stands in court with only the "rights and

[8] Municipalities that are sued, on the other hand, may still rely on the principles of governmental immunity codified in General Statutes § 52-557n. The court in *Conway* cited the availability of governmental immunity to

liability of private persons in like circumstances," in this case, the rights of a private landowner.

Moreover, were the plaintiffs' reading of the statute the correct one, the rights of private persons which the state is granted by the statute would avail it nothing because all of the activities for which it might be sued would necessarily be governmental or eleemosynary in nature. This is surely not the effect intended by the legislature.

This court holds, therefore, that the defense provided by § 52-557g is available to the state in this case provided that Sunset Rock was available to the public without charge for recreational purposes.

The evidence is that Sunset Rock was used primarily as a scenic overlook and as a place for picnicking,[9] satisfying the definition of "recreational purpose" contained in General Statutes § 52-557f (4), which includes "picnicking" and "viewing or enjoying historical, archaeological, scenic or scientific sites," without limiting the definition to only those uses.

For the state to be immune under the statute it must have made Sunset Rock available to the public "without charge, rent, fee or other commercial service . . . ." General Statutes § 52-557g (a). Although the state charged no fee for access to the park, the plaintiffs argue that the state's collection of taxes, some portion of which was appropriated to DEP for the maintenance of Sunset Rock, constitutes a "charge" for the use of the park, denying the state the immunity provided by

municipalities as one of its public policy considerations in denying them immunity under the recreational land use act. *Conway* v. *Wilton,* supra, 238 Conn. 672–73.

[9] A picnic is "an excursion or outing with food usually provided by members of the group and eaten in the open." Merriam-Webster's Collegiate Dictionary (10th Ed. 1998). The testimony of Alan Bielawski was that the trash he collected at Sunset Rock regularly included containers for both food and drink.

the statute. They find support for this interpretation in the following language in *Conway*: "Municipalities make land available through taxes, which in effect constitute an implicit 'charge' for the use of the land. If taxes do indeed constitute a 'charge,' the municipality is stripped of immunity." *Conway* v. *Wilton*, supra, 238 Conn. 674. This concept of taxes as an implicit "charge" for the use of Sunset Rock flies in the face of the statutory definition of a "charge" found in § 52-557f: " 'Charge' means the *admission price or fee asked in return for* invitation or permission to enter or go upon the land . . . ." (Emphasis added.) Thus, a "charge" in the context of the immunity statute would be the *quid pro quo* for the state's permitting a member of the public to enter onto public land, and the state asked for no such "admission price or fee" for entry to Sunset Rock.[10]

In 2011 the General Assembly amended § 52-557f (2) and (3), the definitions of "land" and "owner" for purposes of recreational land use immunity, in order to extend immunity to municipalities in some circumstances. Public Acts 2011, No. 11-211, § 1. Portions of the discussion of this act on the floor of the House of Representatives make clear the legislature's view that the state enjoys the same immunity as private landowners, and always has, and that the levy of taxes does not constitute a "charge" as that term is defined in the statute. Defendant's Posttrial Memorandum of Law, pp. 9–11 (July 20, 2012). While statements of legislators in 2011 cannot be part of the legislative history of an act adopted in 1971, the court sees no reason to adopt a construction at variance with current legislative understanding in the absence of compelling reasons or binding authority.

---

[10] The court in *Conway*, while hypothesizing about whether a general fee might constitute a "charge" for the use of public land, made no reference to the definition of "charge" in the recreational use immunity statute.

The court concludes that the state made Sunset Rock available to members of the public without charge and for recreational purposes. Therefore, the immunity provided by § 52-557g (a) is available to it as a defense to the plaintiffs' claims.

## III

The court's conclusion that recreational land use immunity is available to the state in this case does not end its inquiry into whether the state is liable to the plaintiffs because the state may still be liable for its *"wilful or malicious* failure to guard or warn against a dangerous condition, use, structure or activity . . . ." (Emphasis added.) General Statutes § 52-557h. This is precisely the plaintiffs' claim,[11] and the court must evaluate the evidence of the state's action and inaction to determine whether it sinks to the level of wilful or malicious conduct in light of the established definition of such conduct.

"Wilful misconduct has been defined as intentional conduct designed to injure for which there is no just cause or excuse. . . . [Its] characteristic element is the design to injure either actually entertained or to be implied from conduct and circumstances. . . . Not only the action producing the injury but the resulting injury also must be intentional." (Citations omitted; internal quotation marks omitted.) *Dubay* v. *Irish,* 207 Conn. 518, 533, 542 A.2d 711 (1988). *Dubay* went on to equate wilful conduct with wanton and reckless conduct: "While we have attempted to draw definitional distinctions between the terms wilful, wanton or reckless, in practice the three terms have been treated as meaning the same thing. The result is that wilful, wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme

---

[11] The complaint filed by each plaintiff has a count alleging that the state engaged in wilful and malicious conduct.

departure from ordinary care, in a situation where a high degree of danger is apparent. . . . It is at least clear . . . that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention . . . ." (Internal quotation marks omitted.) Id. Since wilful conduct is equivalent to reckless conduct, it is not only more than negligence but also more than gross negligence. *Bordonaro* v. *Senk*, 109 Conn. 428, 431, 147 A. 136 (1929).

The United States Court of Appeals for the Second Circuit applied this understanding of the meaning of "wilful" conduct to the recreational use immunity statute under consideration here and held that a railroad-landowner was not liable to persons fishing from its property for injuries caused by rocks falling from the adjacent railroad tracks. *Kurisoo* v. *Providence & Worcester Railroad Co.*, 68 F.3d 591, 596 (2d Cir. 1995). The court relied on a Connecticut Supreme Court decision holding that "in order to prove that an act was willful and malicious, the plaintiff must show either that the actor intended to cause the harm or that the harm was the direct and natural consequence of his or her intended act. . . . That is, there must be a substantial certainty that the harm will result from the conduct, a substantial certainty being more than merely a foreseeable risk and more than even a strong probability." (Citation omitted; internal quotation marks omitted.) Id., quoting *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 103, 491 A.2d 368 (1985).

Moreover, several trial court decisions have relied on this common-law definition of "wilful" in granting landowners immunity from liability for injuries on property dedicated to recreational use. See *Conklin* v. *Woodcock Nature Center, Inc.*, Superior Court, judicial district of Danbury, Docket No. 319509 (April 15, 1997);

*Bell* v. *Carasone*, Superior Court, judicial district of New Haven, Docket No. 287223 (January 2, 1991); *Lopes* v. *Post*, Superior Court, judicial district of New Haven, Docket No. CV-90-0301492 (March 16, 1994) (9 C.S.C.R. 438). While none of these decisions are binding on this court, they are persuasive authority that the plaintiffs must prove that the state's action or inaction satisfies the common-law definition of wilful conduct. The plaintiffs have cited no authority to the contrary.

While no appellate level court has defined the term "wilful or malicious" in considering § 52-557h, the Supreme Court has interpreted the identical term in a companion statute,[12] General Statutes § 52-557j, which grants immunity from liability to landowners upon whose land persons operating snowmobiles and other vehicles are injured "unless the injury is caused by the wilful or malicious conduct of the landowner." In *Warner* v. *Leslie-Elliott Contractors, Inc.*, 194 Conn. 129, 138, 479 A.2d 231 (1984), the court applied the common-law definition of wilfulness and the established distinction between wilful and negligent conduct in upholding a trial court's finding that a complaint failed to allege the wilful or malicious conduct necessary to overcome the immunity provided to the defendant by § 52-557j. This court sees no reason to interpret these terms differently in considering the meaning of § 52-557h.

Applying these standards to the present case, the court finds no evidence in the record of conduct or circumstances from which it could conclude that the state's actions here were wilful or malicious. The state recognized the potential hazard posed by the cliff to Sunset Rock visitors by erecting a six foot high chain-link fence between the turn-off areas and the cliff to

---

[12] Both General Statutes §§ 52-557j and 52-557g were adopted at the 1971 session of the General Assembly, albeit in separate public acts.

"guard or warn" visitors of the hazard and by repairing the fence as often as it was vandalized. It posted signs warning of the cliff hazard at both the north and south turn-off areas. The record contains reports in the Hartford Courant of six incidents of persons or vehicles going over the cliff between 1958 and 1965, all before the chain-link fence had been erected. After the fence was erected, the record here discloses no other such incidents for twenty-four years, until 1989, when a woman fell from the cliff in the early morning hours of July 14. The 1989 incident was reported to his superior by Anthony Cantele, DEP's manager for the district in which Sunset Rock was located, along with Mr. Cantele's recommendations of action that should be taken to protect visitors from the dangers posed by the cliff.[13] Thus, the state was on notice of incidents where persons or vehicles had fallen or been driven over the cliff both before and after the fence was installed, but these incidents were few and far between and have little bearing on the circumstances in existence on June 10, 1994.

The plaintiffs make much of the fact that, in the course of argument over the admissibility at trial of subsequent remedial measures taken by the state, the state stipulated that it was feasible for it to have taken precautionary measures prior to the plaintiffs' fall off the cliff at Sunset Rock. That it was feasible for the state to have taken remedial measures does not mean

---

[13] Mr. Cantele's testimony at trial that his intention in writing the memo was to alert DEP to the hazard posed by the *downed fence*, not the cliff, was so patently false that the court gave it no credence. He had already testified that the fence had been in place since he was appointed to his position in 1971, was frequently torn down by vandals who left large portions lying on the ground, yet he never reported this "hazard" until a person fell from the cliff eighteen years later. It is apparent from these circumstances and the internal content of the memo that the "natural hazard" Mr. Cantele was cautioning against was a visitor's falling off the cliff, not tearing his skin or clothes on the fence. See exhibit 7.

that it was "wilful or malicious" for the state not to have done so. "Failure to take affirmative remedial action, even if wrongful, does not demonstrate an affirmative intent to create a situation that causes personal injury." *Melanson* v. *West Hartford*, 61 Conn. App. 683, 689, 767 A.2d 764, cert. denied, 256 Conn. 904, 772 A.2d 595 (2001); see also *Sullivan* v. *Lake Compounce Theme Park, Inc.*, 277 Conn. 113, 889 A.2d 810 (2006).

Given the rarity of injuries suffered by persons visiting Sunset Rock, especially after the state installed the chain-link fence, the court cannot find that there was a "substantial certainty"; *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 103; that the harm threatened by the presence of the cliff would occur or that the state's failure to take action beyond installation and repair of the fence and the posting of warning signs was "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Internal quotation marks omitted.) *Dubay* v. *Irish*, supra, 207 Conn. 533.

The court heard expert testimony from both the plaintiffs and the state on whether the state's actions were adequate to ensure public safety. The experts agreed that the volume of use of a state park is an important factor in determining what safety measures are necessary to protect the public from hazards present in the park. Sunset Rock was a little-used park, according to the evidence, available only as a scenic overlook and as a site for meeting and picnicking. There were no entry signs or gates, no staff assigned to the park, no visitor center, no public restrooms or portable toilets, no running water, no picnic tables or grills, no hiking trails. In this undeveloped condition, the state's expert opined, public safety required no more than the state provided in the way of warning and protection from the hazard of the cliff, and the court agrees. The state's expert pointed to other state and national parks in

which natural hazards at least as potentially dangerous as the cliff were present where no guardrails at the cliff edge, such as demanded by the plaintiffs' expert, were installed. Likewise, the experts agreed that the history of prior injuries was a factor to be considered in evaluating the safety precautions. As pointed out earlier, in the twenty-five years prior to the plaintiffs' fall, the record disclosed only one similar incident.

The court finds that the weight of the experts' testimony supports its conclusion that the state did not act wilfully or maliciously in its management of Sunset Rock.

The court finds that the state has met its burden of establishing that the second special defense asserted in its answer applies to the plaintiffs' claims. This conclusion requires that a verdict and judgment be entered in favor of the state on all counts of the plaintiffs' complaints and obviates consideration of the claims of negligence asserted by the plaintiffs and the defenses of contributory/comparative negligence asserted by the state.

Given the age of this case, however, and the potential for appeal, the court will state its findings and conclusions on the state's liability in negligence so that all dispositive issues might be considered should an appeal be taken.

IV

The court finds from the evidence that the plaintiffs were trespassers on the state's land when they entered Sunset Rock after dark on June 10, 1994, i.e., they "intentionally and without consent or privilege" entered upon the property. See Black's Law Dictionary (7th Ed. 1999). The park was closed at sunset, and the plaintiffs either knew or should have known that they had no business being there after dark. Ordinarily, a possessor of land

"has the duty only to refrain from causing injury to a trespasser intentionally, or by willful, wanton or reckless conduct." (Citation omitted; internal quotation marks omitted.) *Maffucci* v. *Royal Park Ltd. Partnership*, 243 Conn. 552, 558, 707 A.2d 15 (1998). The court finds further that the state had actual or constructive knowledge that trespassers such as the plaintiffs "constantly intrude[d] upon" the park. (Internal quotation marks omitted.) Id., 559, quoting § 335 of the Restatement (Second) of Torts. Even with that knowledge, however, the rules of the Restatement adopted in *Maffucci* and in *Morin* v. *Bell Court Condominium Assn., Inc.*, 223 Conn. 323, 333, 612 A.2d 1197 (1992), impose a higher but still limited duty on the state.

Possessors of land who have knowledge, actual or constructive, that trespassers are "constantly intruding" on their land, like the state in this case, if they are carrying on "*activities* highly dangerous to constant trespassers" are liable for bodily harm caused to such trespassers if they carry on this activity without reasonable care for the trespassers' safety. (Emphasis added.) Id., citing § 334 of the Restatement (Second) of Torts. The state was carrying on no such activities at Sunset Rock.

Likewise, possessors of land are "subject to liability for bodily harm caused to [constant trespassers] by an *artificial condition* on the land if (a) the condition (i) is one which the possessor has created or maintains, and (ii) is, to [the possessor's] knowledge, likely to cause death or serious bodily harm to such trespassers, and (iii) is of such a nature that [the possessor] has reason to believe that such trespassers will not discover it, and (b) the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved." (Emphasis added; internal quotation marks omitted.) *Maffucci* v. *Royal Park Ltd. Partnership*, supra, 243 Conn. 559–60. The dangerous condition

at Sunset Rock was a natural, not artificial, one, the presence of the steep cliff, and even under the Restatement rule adopted in *Maffucci,* the state is not liable to trespassers like the plaintiffs for bodily injury suffered as a result of the hazard created by this natural condition.

Since the state had no duty to the plaintiffs beyond the limited one imposed by the Restatement rules adopted by the Supreme Court in *Maffucci* and *Morin,* it is not liable to them in negligence for the injuries they claim to have suffered. This conclusion would require a verdict and judgment for the state on the first count of Mr. Piotrowski's complaint and the first, third and fifth counts of Mr. Burgess' complaint,[14] without consideration of the state's first special defense; viz., that the plaintiffs' injuries were caused by their contributory negligence.

Nevertheless, in order to make a complete record of the findings and conclusions of this court, which tried all the liability issues, the court finds that the state has met its burden of proving by a preponderance of the evidence that each plaintiff was more than 50 percent negligent in causing his own injuries. Mr. Burgess entered Sunset Rock long after it was closed to the public and, with a blood alcohol content of 0.197,[15] proceeded to walk around in the area of the cliff, even though he knew from previous visits to the park that the cliff was in close proximity to the fence, was irregular in contour and was obscured by foliage. Mr. Piotrowski, knowing that his friend had just fallen off the cliff, made a conscious decision to attempt a rescue by climbing down the cliff himself. In the pitch dark of the unlit

[14] Mr. Piotrowski's operative complaint is his third amended complaint dated February 24, 2005; Mr. Burgess' operative complaint is his second amended complaint dated September 21, 2006.

[15] The state introduced credible expert testimony from Marc Bayer, M.D., as to the blood alcohol level of each plaintiff.

park and with a blood alcohol content of 0.143, he engaged in what can only be described as reckless conduct.[16] He, too, entered Sunset Rock after it was closed to the public and acknowledged at trial that he knew that he and Mr. Burgess should not be there. These conclusions would require a verdict and judgment for the state on all of the plaintiffs' negligence counts.

The court's earlier conclusion that the state did not engage in wilful or malicious conduct requires a verdict and judgment for the state on the second and third counts of Mr. Piotrowski's complaint and the second count of Mr. Burgess' complaint.

## V

Judgment enters for the defendant state of Connecticut on all counts in both complaints.

---

[16] Mr. Piotrowski's conduct was not the "reasonable" conduct necessary to invoke the "rescue doctrine" discussed in Cote v. Palmer, 127 Conn. 321, 326–27, 16 A.2d 595 (1940), that is, it was not the "conduct of an ordinarily prudent person under the same circumstances." Id., 328.