MICHAEL SCRAPCHANSKY *v.* TOWN OF
PLAINFIELD ET AL.
(14655)

CALLAHAN, BORDEN, NORCOTT, KATZ and PALMER, Js.

Argued March 24—decision released July 13, 1993

Christopher M. Licari, with whom was *Steven J. Errante,* for the appellant (plaintiff).

*Andrew J. O'Keefe,* with whom were *Denise Rodosevich* and, on the brief, *Maureen Sullivan Dinnan,* for the appellees (defendants).

CALLAHAN, J. The plaintiff, Michael Scrapchansky, brought this action against the defendants, the town of Plainfield (town) and the Plainfield board of education (board), for personal injuries suffered while playing in an American Legion baseball game on a field owned by the town and controlled by the board. The trial court granted the defendants' motion for summary judgment, ruling that, pursuant to the Connecticut Recreational Land Use Act (act); General Statutes §§ 52-557f through 52-557i;[1] the defendants were

[1] "[General Statutes] Sec. 52-557f. LANDOWNER LIABILITY FOR RECREATIONAL USE OF LAND. DEFINITIONS. As used in sections 52-557f to 52-557i, inclusive:

immune from liability for the plaintiff's injuries. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). On appeal, the plaintiff claims that the trial court improperly granted the defendants'

"(1) 'Charge' means the admission price or fee asked in return for invitation or permission to enter or go upon the land;

"(2) 'Land' means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty;

"(3) 'Owner' means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises;

"(4) 'Recreational purpose' includes, but is not limited to, any of the following, or any combination thereof: Hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, snow skiing, ice skating, sledding, hang gliding, sport parachuting, hot air ballooning and viewing or enjoying historical, archaeological, scenic or scientific sites."

"[General Statutes] Sec. 52-557g. LIABILITY OF OWNER OF LAND AVAILABLE TO PUBLIC FOR RECREATION; EXCEPTIONS. (a) Except as provided in section 52-557h, an owner of land who makes all or any part of the land available to the public without charge, rent, fee or other commercial service for recreational purposes owes no duty of care to keep the land, or the part thereof so made available, safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on the land to persons entering for recreational purposes.

"(b) Except as provided in section 52-557h, an owner of land who, either directly or indirectly, invites or permits without charge, rent, fee or other commercial service any person to use the land, or part thereof, for recreational purposes does not thereby: (1) Make any representation that the premises are safe for any purpose; (2) confer upon the person who enters or uses the land for recreational purposes the legal status of an invitee or licensee to whom a duty of care is owed; or (3) assume responsibility for or incur liability for any injury to person or property caused by an act or omission of the owner.

"(c) Unless otherwise agreed in writing, the provisions of subsections (a) and (b) of this section shall be deemed applicable to the duties and liability of an owner of land leased to the state or any subdivision thereof for recreational purposes."

"[General Statutes] Sec. 52-557h. OWNER LIABLE, WHEN. Nothing in sections 52-557f to 52-557i, inclusive, limits in any way the liability of any owner of land which otherwise exists: (1) For wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity; (2) for

motion for summary judgment because: (1) the defendants had not made the field "available to the public" within the meaning of § 52-557g (a); and (2) an organized league baseball game is not a "recreational purpose" as that term is used in § 52-557f (4). We affirm the judgment of the trial court.

The relevant facts are as follows. On June 22, 1986, while chasing a batted ball, the plaintiff ran into a stone wall that bordered the baseball field. As a result, he suffered various personal injuries. At the time of the accident, the plaintiff was a member of the Danielson/Moosup American Legion baseball team, and was playing center field in a league game. The field on which he was injured is adjacent to the Plainfield High School. It is owned by the town and controlled by the board. Since 1973, the town had permitted the American Legion team to use the field without charge, fee, or rent, whenever school was not in session.

The plaintiff's complaint alleged that the defendants were liable for his injuries under theories of both negligence and nuisance. The defendants moved for summary judgment on the ground that they were immune from liability under the act. The trial court granted the defendants' motion for summary judgment, concluding that the act rendered the defendants immune from suit because the field on which the plaintiff had been injured had been made "available to the public with-

injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof, except that, in the case of land leased to the state or a subdivision thereof, any consideration received by the owner for the lease shall not be deemed a charge within the meaning of this section."

"[General Statutes] Sec. 52-557i. OBLIGATION OF USER OF LAND. Nothing in sections 52-557f to 52-557i, inclusive, shall be construed to relieve any person using the land of another for recreational purposes from any obligation which he may have in the absence of said sections to exercise care in his use of such land and in his activities thereon, or from the legal consequences of failure to employ such care."

out charge, rent [or] fee" within the meaning of § 52-557g (a), and because a baseball game constituted a "recreational purpose" pursuant to § 52-557f (4).

I

The plaintiff first claims that the defendants failed to make the field "available to the public" as contemplated by § 52-557g of the act because there were restrictions on its use. The plaintiff argues that because the defendants did not make the field "available to the public," they were not entitled to the immunity afforded by the act and the trial court, therefore, had improperly granted the defendants' motion for summary judgment. We disagree.

Practice Book § 384 provides that summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See *Connecticut Bank & Trust Co.* v. *Carriage Lane Associates*, 219 Conn. 772, 780–81, 595 A.2d 908 (1991). "Once the moving party has presented evidence in support of the motion for summary judgment, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. 'Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court . . . .' " (Citations omitted.) *Burns* v. *Hartford Hospital*, 192 Conn. 451, 455, 472 A.2d 1257 (1984). We recognize that "[i]n deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Connecticut Bank & Trust Co.* v. *Carriage Lane Associates*, supra, 781.

Section 52-557g (a) provides in relevant part: "[A]n owner of land who *makes all or any part of the land available to the public* without charge, rent, fee or other commercial service for recreational purposes owes no duty of care to keep the land, or the part thereof so made available, safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on the land to persons entering for recreational purposes." (Emphasis added.)

Before the trial court, it was undisputed that, in order to prevail on their motion for summary judgment, the defendants, the owners[2] of the ball field, were required by § 52-557g (a) to have made the field "available to the public" for recreational purposes. *Manning* v. *Barenz,* 221 Conn. 256, 260, 603 A.2d 399 (1992). In support of their motion, the defendants presented the affidavit of Albert DePetrillo, superintendent of the board, who stated that the high school playing field was made available to the public for recreational purposes without fee, charge or rent. In response, the plaintiff presented evidence that restrictions applied to the public's use of the field. In particular, the plaintiff presented excerpts from the transcript of the deposition taken of DePetrillo, wherein DePetrillo had stated that the field was available to the public only when school was not in session and that any team desiring to use the field was required to obtain permission to do so in order to avoid scheduling conflicts with another event.

The plaintiff argues on appeal that by limiting the use of the field to times when school was not in session and by requiring permission for its use, the defend-

---

[2] The term owner is broadly defined by General Statutes § 52-557f (3), which provides: " 'Owner' means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises." It was undisputed that both the town and the board were considered owners of the land. See *Manning* v. *Barenz,* 221 Conn. 256, 259, 603 A.2d 399 (1992).

ants did not make the field "available to the public" in the manner contemplated by § 52-557g. The plaintiff further contends that by permitting scheduled league games to occupy the playing field at a given time, the defendants necessarily excluded the concurrent use of the field by others, thereby contravening the purpose of the act to make recreational land available to the public. In support of his argument, the plaintiff cites to the legislative history of the act, claiming that the legislature envisioned that immunity from liability under the act would only be afforded to landowners who "allow their property to be used for the entire citizenry." 14 H.R. Proc., Pt. 4, 1971 Sess., p. 1806, remarks of Representative David Lavine.

Although the purpose of the act is to make land accessible for recreational use by the public, nothing in the language of § 52-557g (a) mandates that land, in order to be "available to the public" under the act, must be open in its entirety to everyone simultaneously. In *Genco* v. *Connecticut Light & Power Co.*, 7 Conn. App. 164, 508 A.2d 58 (1986), it was held that signs posted by the owner of a lake that expressly restricted the use of the lake in certain locations did not make the land unavailable to the public. Stated differently, the word "public" in § 52-557g (a) does not require that recreational land be made available to all members of the public at all times in order to provide a landowner with immunity from liability. "For an area to be 'open to public use' it does not have to be open to 'everybody all the time.' *State ex rel. Anderson* v. *Witthaus,* 340 Mo. 1004, 1011, 102 S.W.2d 99 (1937); see also *Peachtree on Peachtree Inn, Inc.* v. *Camp,* 120 Ga. App. 403, 410, 170 S.E.2d 709 (1969); *Commissioner* v. *Baughman,* 357 Pa. Super. 535, 538, 516 A.2d 390 (1986), appeal denied, 515 Pa. 572, 527 A.2d 534 (1987)." *State* v. *Boucher,* 207 Conn. 612, 615, 541 A.2d 865 (1988). The evidence presented by the defendants

in support of their motion for summary judgment clearly demonstrated that, given certain reasonable restrictions, any group or member of the public was entitled to use the baseball field. The fact that the public's use of the field was limited to the times when school was not in session, or by the obvious fact that only two teams could play baseball on the same field at the same time, does not mean the field was not "available to the public" under § 52-557g (a). See id. The imposed restrictions merely served to permit the orderly use of the field. Without restrictions, as the trial court noted, the defendants would have had to sanction a "free for all" in order to be entitled to immunity under the statute, a result clearly not contemplated by § 52-557g (a).

The plaintiff's suggested interpretation of § 52-557g, that there must be no restrictions on the public's use of land in order for land to be covered by the act, albeit ideal, is impractical given the realities of recreational land use planning. "[P]rinciples of statutory construction . . . require us to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results." *Turner* v. *Turner,* 219 Conn. 703, 712, 595 A.2d 297 (1991). "We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve. *Peck* v. *Jacquemin,* 196 Conn. 53, 63–64, 491 A.2d 1043 (1985)." Id., 713. Not all land made available to the public for recreational use consists of limitless expanses which the entire public can enjoy at the same time. The owners of public and private land, lakes, ponds, parks, playgrounds, and playing fields across the state obviously need the ability to place reasonable restrictions on the use of their property in order to induce them to make their land available for the enjoyment of the public. Without the ability to impose some restrictions, the owners of land desirable for recreational purposes would be loath to make it available for

public use for fear that the use would be unmanageable. The plaintiff's interpretation of the act would invite chaos and would undermine its purpose of providing an incentive to landowners to allow their land to be used by the public for recreational purposes.[3] For instance, any landowner considering allowing public use of his property might think twice before doing so if he or she were required to tolerate its use at all hours of the day or night in order to be entitled to immunity from liability. The legislature, in enacting § 52-557g (a), must have contemplated reasonable restrictions on the public's use of land covered by the statute. Because the plaintiff does not claim that the restrictions imposed by the defendants on the use of their land were unreasonable, their land was "available to the public" as contemplated by the act.

## II

The plaintiff next claims that because the activity engaged in, a league baseball game, was not a "recreational purpose" as contemplated by § 52-557f (4), the trial court improperly granted the defendants' motion for summary judgment. We disagree.

Section 52-557f (4) provides that: " 'Recreational purpose' includes, *but is not limited to,* any of the following, or any combination thereof: Hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, snow skiing, ice skating, sledding, hang gliding, sport parachuting, hot air ballooning and viewing or enjoying historical, archaeological, scenic or scientific sites." (Emphasis added.)

---

[3] "[W]e have long depended and will continue to depend upon the generosity of private owners of land and water to open their property to the use and enjoyment of their fellow citizens. . . . So this act here is to allow limited liability . . . of Connecticut property owners to open their land for public use without charge." 14 H.R. Proc., Pt. 4, 1971 Sess., p. 1805, remarks of Representative David Lavine.

The plaintiff contends that the absence of any reference to organized team sports in § 52-557f (4) indicates that the legislature did not intend to include a league baseball game within its definition of "recreational purpose." The plaintiff acknowledges that the recreational purposes enumerated in § 52-557f (4) are expressly stated *not* to be exclusive. Relying on the doctrine of ejusdem generis, however, he points out that the statutory list yields two common characteristics that any activity must possess in order to be properly regarded as "recreational" under § 52-557f (4). These characteristics are that the activity: (1) must be regularly engaged in on an informal, unstructured basis; and (2) entail the use or enjoyment of land in its natural state. The plaintiff maintains that because a league baseball game possesses neither of these characteristics, it cannot be regarded as a "recreational purpose" under § 52-557f (4).

"According to the [doctrine] of ejusdem generis, unless a contrary intent appears, where general terms are followed by specific terms in a statute, the general terms will be construed to embrace things of the same general kind or character as those specifically enumerated. 2A J. Sutherland, Statutory Construction (4th Ed. Sands [1986]) § 47.17." *State* v. *Russell,* 218 Conn. 273, 278, 588 A.2d 1376 (1991). The application of this doctrine to the list of recreational purposes in § 52-557f (4) does not persuade us, however, that the legislature intended to exclude other more popular and more obvious recreational activities, many of which are engaged in as team sports, from furnishing immunity from liability to landowners who provide the public with free facilities for their enjoyment. Nothing in the act specifically manifests such an intention or specifically ordains that it was meant to apply only to individual, informal activities. If the legislature had desired to exclude organized activities and team sports from the

purview of the statute, it would seem logical that it would have done so explicitly. In fact, swimming, ice skating and skiing, which are all listed in the statute, frequently lend themselves to team competition. Moreover, many of the other activities mentioned are often engaged in on a scheduled, competitive or structured basis. The interpretation of the term "recreational purpose" urged by the plaintiff would therefore exclude activities actually enumerated in the statute as "recreational purpose[s]" merely because they possessed a certain level of organization, a result not likely to have been intended by the legislature.

The definition of "recreational purpose" in § 52-557f (4), which in reality is simply a nonexclusive list of leisure activities, was originally drawn from a model act promulgated by the Council of State Governments. See 24 Council of State Governments, "Public Recreation on Private Lands: Limitations on Liability," Suggested State Legislation (1965) pp. 150–52.[4] Neither the prefatory remarks accompanying the model act nor Connecticut's own legislative history sheds light on the meaning to be attributed to the statute's use of enumerated examples and its "not limited to" language. We conclude, however, that the enumerated list serves only to denote a variety of activities, some of which are rather unique and not ordinarily characterized as recreational, that the General Assembly legislated should be regarded as recreational for purposes of the act. The list was not intended to exclude sports, such as baseball, that are universally recognized as recreational.

---

[4] The model act provided in part: "Section 2. As used in this act . . . (c) 'Recreational purpose' includes, but is not limited to, any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites." 24 Council of State Governments, "Public Recreation on Private Lands: Limitations on Liability," Suggested State Legislation (1965) p. 151.

In summary, we conclude that the list of activities enumerated in § 52-557f (4) is not exclusive and "is not limited to" those activities listed. Recreational activities naturally arise from the desires and preferences of the person who is enticed away from the troubles and toil of the workaday world and who is drawn to the outdoors to partake of an activity that is pleasant for its own sake. Had the legislature intended to include as "recreational purpose[s]" only those activities enumerated in the statute and similar activities, and then only if conducted in an informal manner, it would have slighted the recreational preferences of a large portion of the population. Team sports are certainly recreational and no less so if teams are organized into a league. As the late A. Bartlett Giamatti commented, "sports are in today's world what they were in yesterday's very different one—a shared moment of leisure." A. Giamatti, Take Time for Paradise: Americans and Their Games (1989) pp. 14–15.[5] Because an amateur sport is organized and played by teams does not deprive it of its recreational qualities.[6] To conclude otherwise would be to impose an overly restrictive meaning on

---

[5] Giamatti continued: "Sports represent a shared vision of how we continue, as individual, team, or community, to experience a happiness or absence of care . . . and that under the rubric of leisure, sport—either watched or played—has availed itself fully of whatever prestige or privilege accrues to shared activities that have no purpose except fully to be themselves." A. Giamatti, Take Time for Paradise: Americans and Their Games (1989) pp. 14–15.

[6] Courts in other jurisdictions have directly and indirectly interpreted their recreational land use acts to apply to team sports, and in particular baseball. See, e.g., *Page* v. *Louisville,* 722 S.W.2d 60 (Ky. App. 1986) (injuries sustained when plaintiff stepped into hole on the field); *Anderson* v. *Springfield,* 406 Mass. 632, 549 N.E.2d 1127 (1990) (injuries suffered on ball park because of defect in home plate); *Miller* v. *Dayton,* 42 Ohio St. 3d 111, 537 N.E.2d 1294 (1989) (softball player injured while sliding into second base); see also *Edwards* v. *Birmingham,* 447 So. 2d 704 (Ala. 1984) (plaintiff was owed no duty of care when he was injured while playing baseball on a baseball field in a public park); *Wiegand* v. *Mars National Bank,* 454 A.2d 99 (Pa. Super. 1982) (injuries sustained while playing football on an empty lot).

the term "recreational purpose" in the statute, a meaning that is not warranted by the "includes, but is not limited to" language of § 52-557f (4).[7]

The plaintiff next contends that a common characteristic distilled from the listed recreational purposes in § 52-557f (4) is that the activity must involve the use of a particular type of land, i.e., woodland, fields, lakes or other undeveloped open spaces. There is, however, nothing in the plain language of the statute to indicate that the only land to which the act applies is land in its natural state. The word "land" is broadly defined in § 52-557f (2), which provides: " 'Land' means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty." Moreover, in *Manning* v. *Barenz,* supra, 261–62, we concluded that the landowner was entitled to immunity despite the fact that the accident took place, not in the forest primeval, but in a municipal park, owned and developed by the municipality and supervised by municipal employees.

Although the act, as originally passed, appeared to provide immunity primarily to owners of large tracts of land, a subsequent amendment to § 52-557g (a) indicates that the size of the land is not a relevant consideration in terms of the coverage provided by the act. Originally, General Statutes (Rev. to 1972) § 52-557g (a) read: "Except as provided in section 52-557h, an owner of *five or more acres of land* who makes such land available to the public without charge . . . owes no duty of care . . . ." (Emphasis added.) In 1973, the legislature amended the statute by deleting the phrase "five

---

[7] In *Manning* v. *Barenz,* 221 Conn. 256, 260, 603 A.2d 399 (1992), the plaintiff, who was only two years old at the time of the accident, was obviously not engaged in any specific "recreational purpose" as enumerated in the statute.

or more acres of land" and substituting "all or any part of the land" made available to the public. Public Acts 1973, No. 73-70. The amendment clearly indicated that the size of the land made available to the public for recreational purposes would not limit the scope of the immunity provided.

The plaintiff, despite *Manning* and the 1973 amendment to the act, nonetheless argues that the land intended to be covered by the act was that preserved in its pristine state. Turning to the legislative history of the act, the plaintiff argues that the focus of the act was on "enjoyment of the rural life in Connecticut." 14 H.R. Proc., Pt. 4, 1971 Sess., p. 1805, remarks of Representative David Lavine. Consequently, the scope of the act, according to the plaintiff, was not intended to include improved land in suburban or urban settings. The plaintiff further maintains that by expanding the scope of the act to apply to any tract of land, even those in urban and residential areas, it will encourage owners of such land, including municipalities, to manage and supervise their properties negligently. Consequently, the plaintiff suggests that, although the act may encourage landowners to open up their lands to the public for recreational uses, it will also unfairly cloak landowners with immunity from liability and become a formidable hurdle to the recovery of damages in instances where the land involved feasibly could have been supervised and made safe.

Courts in other jurisdictions are divided on whether their state's recreational land use acts apply when injuries occur on smaller improved tracts of land. See *Gibson* v. *Keith,* 492 A.2d 241, 244 (Del. 1985) ("we find [the act] not applicable to urban or residential areas improved with swimming pools, tennis courts, and the like"); *Herring* v. *Hauck,* 118 Ga. App. 623, 165 S.E.2d 198 (1968) (act not applicable to backyards or vacant lots in residential areas); *O'Connell* v. *Forest Hill Field*

*Club,* 119 N.J. Super. 317, 291 A.2d 386 (1972) (act was determined not to apply to a public golf course); *Tijerina* v. *Cornelius Christian Church,* 273 Or. 58, 539 P.2d 634 (1975) (act held not to be applicable to a three acre ball diamond adjacent to a suburban church); *Kucher* v. *Pierce County,* 24 Wash. App. 281, 288, 600 P.2d 683 (1979) (act not applicable to park because it was "improved, routinely inspected, and . . . inside the city of Tacoma"); compare *Rodrigue* v. *Fireman's Fund Ins. Co.,* 449 So. 2d 1042 (La. 1984) (act applied to unsafe bleachers at a playground); *Pratt* v. *State,* 408 So. 2d 336 (La. App. 1981), cert. denied, 412 So. 2d 1098 (La. 1982) (act applied to drowning at lake adjacent to recreational area); *Watson* v. *Omaha,* 209 Neb. 835, 312 N.W.2d 256 (1981) (act applied to slippery slide located at a park); *Martinez* v. *Harris County,* 808 S.W.2d 257 (Tex. App. 1991) (act applied to playground equipment).

Our decision in *Manning* v. *Barenz,* supra, however, settled the question in Connecticut of whether the act affords immunity from liability for negligence or nuisance to a municipality for an injury suffered on town land developed as a playground. In *Manning,* we held that the town of Bloomfield was immune from liability for a serious injury suffered by a two year old boy when the lid of a heavy metal storage box at a town owned park fell on his thumb.[8] Having determined that

---

[8] That our decision in *Manning* v. *Barenz,* 221 Conn. 256, 603 A.2d 399 (1992), applied the act to municipalities is not inconsistent with many state courts that have applied their recreational use acts to public owners. See, e.g., *Stone Mountain Memorial Assn.* v. *Herrington,* 225 Ga. 746, 171 S.E.2d 521 (1969); *Pratt* v. *State,* 408 So. 2d 336 (La. App. 1981), cert. denied, 412 So. 2d 1098 (La. 1982); *Watson* v. *Omaha,* 209 Neb. 835, 312 N.W.2d 256 (1981); *Trimblett* v. *State,* 156 N.J. Super. 291, 383 A.2d 1146 (1977); *Sega* v. *State,* 60 N.Y.2d 183, 456 N.E.2d 1174, 469 N.Y.S.2d 51 (1983). Legislation in several states has also explicitly extended their states' recreational use acts to public owners. See, e.g., Ala. Code § 35-15-21 (1) (1991) (owner is "[a]ny public or private organization . . . any federal, State, or local political subdivision or any agency"); Colo. Rev. Stat. § 33-41-102 (3)

the field on which the plaintiff was injured was "available to the public" and that a league baseball game is a "recreational purpose," we can see no discernible difference between the present case and *Manning*. *Manning* dictates that the defendants here were entitled to immunity from liability pursuant to the act for the plaintiff's injuries.

The judgment is affirmed.

In this opinion BORDEN and NORCOTT, Js., concurred.

KATZ, J., with whom PALMER, J., joins, dissenting. "Brevity may be the soul of wit, but in legislative drafting, it is rarely the essence of clarity."[1] The cloak of immunity established in the Connecticut Recreational Land Use Act (act); General Statutes §§ 52-557f through 52-557i; leaves several important questions of interpretation open to judicial construction. The one at the core of this opinion is whether the act applies to municipalities. In *Manning* v. *Barenz*, 221 Conn. 256, 603 A.2d 399 (1992), this court held that the act did apply to municipalities on the basis of the " 'clear and unambiguous' " definition of the term "owner." Id., 260. Today, the majority builds on this recent decision to afford immunity pursuant to the act to a municipality that allowed a baseball team playing in a league game to use a field adjacent to the town's high school without charge whenever school was not in session. Because I do not agree that the act applies to municipalities, I respectfully dissent.

---

(1984) (owner includes "any public entity as defined in the 'Colorado Governmental Immunity Act' . . . which has an interest in land"); Idaho Code § 36-1604 (b) (1) (Sup. 1992) (" '[l]and' means private or public land, roads, trails, water, watercourses . . . private or public ways"); Ohio Rev. Code Ann. § 1533.18 (A) (Baldwin 1990) (premises include "all state-owned lands"); Wash. Rev. Code Ann. § 4.24.210 (West 1988) (extends to "[a]ny public or private landowners").

[1] G. Thompson & M. Dettmer, "Trespassing on the Recreational User Statute," 61 Mich. B.J. 726 (1982).

If a statute is absolutely clear on its face, legislative history need not be consulted. *Rose* v. *Freedom of Information Commission,* 221 Conn. 217, 225, 602 A.2d 1019 (1992). If it is susceptible to alternative conflicting interpretations, however, or if its application to a particular situation reveals a latent ambiguity in seemingly unambiguous language, or if construction of this seemingly unambiguous statute results in an altering of the common law, we look beyond the words of the statute. *State* v. *Blasko,* 202 Conn. 541, 553, 522 A.2d 753 (1987). In such cases we will examine the legislative intent, including a consideration of the specific language and its context, pertinent history, the conditions and circumstances surrounding the statute's enactment, and the objective that the statute was calculated to address. See *Beloff* v. *Progressive Casualty Ins. Co.,* 203 Conn. 45, 54–55, 523 A.2d 477 (1987); *DeFonce Construction Corporation* v. *State,* 198 Conn. 185, 187, 501 A.2d 745 (1985). Use of these tools of construction in this case suggests that the immunity conferred by the act was the carrot that legislators dangled before private landowners to encourage them to make their property available for public recreation. I believe that the decision by this court to include municipalities within the act's definition of owner is not consistent with the true legislative intent and, in effect, bestows a benefit on government never contemplated.

The language in the act must be examined in the context of what was happening throughout the country at the time of its enactment. "Identifying the societal problems which the legislature sought to address may be particularly helpful in determining the true meaning of the statute." *State* v. *Parmalee,* 197 Conn. 158, 161–62, 496 A.2d 186 (1985). More and more Americans were participating in an expanding range of outdoor recreational activities. Overpopulation and increased leisure time had strained existing public

recreation areas. State and municipal governments were struggling to locate alternative resources to accommodate increasing demand for recreational property. One such alternative under consideration was the utilization of privately owned land for public recreation. G. Thompson & M. Dettmer, "Trespassing on the Recreational User Statute," 61 Mich. B.J. 726, 727 (1982).

As part of its attempt to foster availability of private land for public recreational use, the Connecticut legislature created a vehicle to increase public access to private property. Parroting a model act promulgated in 1965 by the Council of State Governments,[2] the Con-

---

[2] The model act provided in part:

"PUBLIC RECREATION ON PRIVATE LANDS: LIMITATIONS ON LIABILITY . . .

"Section 1. The purpose of this act is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.

"Section 2. As used in this act:

"(a) 'Land' means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty.

"(b) 'Owner' means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises.

"(c) 'Recreational purpose' includes, but is not limited to, any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites.

"(d) 'Charge' means the admission price or fee asked in return for invitation or permission to enter or go upon the land.

"Section 3. Except as specifically recognized by or provided in Section 6 of this act, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes.

"Section 4. Except as specifically recognized by or provided in Section 6 of this act, an owner of land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby:

"(a) Extend any assurance that the premises are safe for any purpose.

necticut legislature enacted General Statutes §§ 23-27a through 23-27k, entitled "An Act Limiting the Liability of Property Owners Toward Persons Using Their Land for Recreation," in 1967.[3] See G. Thompson & M. Dettmer, supra, pp. 726–27. This precursor to the Recreational Land Use Act was intended to target an underutilized resource. "The intention of the act is to encourage the farmer, the party who has hundreds of thousands of acres to invite the public in to make use of the land without having [the] liability that they normally would have under the common law. The Department of Agriculture feels that this would greatly increase the open space use throughout the state of Connecticut." 12 H.R. Proc., Pt. 9, 1967 Sess., p. 4254,

"(b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.

"(c) Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.

"Section 5. Unless otherwise agreed in writing, the provisions of Sections 3 and 4 of this act shall be deemed applicable to the duties and liability of an owner of land leased to the state or any subdivision thereof for recreational purposes.

"Section 6. Nothing in this act limits in any way any liability which otherwise exists:

"(a) For willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity.

"(b) For injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof, except that in the case of land leased to the state or a subdivision thereof, any consideration received by the owner for such lease shall not be deemed a charge within the meaning of this section.

"Section 7. Nothing in this act shall be construed to:

"(a) Create a duty of care or ground of liability for injury to persons or property.

"(b) Relieve any person using the land of another for recreational purposes from any obligation which he may have in the absence of this act to exercise care in his use of such land and in his activities thereon, or from the legal consequences of failure to employ such care.

"Section 8. [Insert effective date.]" 24 Council of State Governments, "Public Recreation on Private Lands: Limitations on Liability," Suggested State Legislation (1965) pp. 150–52.

[3] Public Acts 1967, No. 623.

remarks of Representative Bernard Avcollie. "It will for the most part in my opinion do something that many of us who live in the rural areas have for a long time wanted. . . . Within a very short driving distance of every major city in this state there are vast areas of land that could be used for recreational purposes and the only thing in the path standing in the way, the only thing which has prevented the owners from allowing use of their land for recreational purposes has been the possible liability which they would incur if people using it for recreational purposes were injured on their land this is the target point of this bill. To say to any land-owner if you register your land for recreational pur-poses and those who come on are injured again through no fault of yours, the owner, then you will not be lia-ble. I think the state of Connecticut and a large per-centage certainly of the urban population are going to benefit under this bill, it relieves the state of the neces-sity for purchasing, it relieves the state of the neces-sity for maintaining land that could very well serve for picnicking, for hiking, for horseback riding and for many other recreational activities which, because of lack of faith in the urban areas is very limited at the present time." 12 H.R. Proc., Pt. 9, 1967 Sess., pp. 4255–56, remarks of Representative Robert King. "A review of the legislative history reveals that the clear purpose of § 52-557g is an attempt to satisfy the public's need for recreational and open space by encouraging *private land owners,* through limiting their liability, to open their land to public use." (Emphasis added.) *Genco* v. *Connecticut Light & Power Co.,* 7 Conn. App. 164, 168–69, 508 A.2d 58 (1986).

Connecticut passed the Recreational Land Use Act in 1971. Without published comment, the legislature repealed §§ 23-27a through 23-27k of title 23, entitled Parks, Forests and Public Shade Trees, and enacted §§ 52-557f through 52-557i in its place. Public Acts 1971,

No. 249. The philosophy behind the legislation was again made clear—to make the option of opening private land for public recreational use more attractive.[4] Representative David Lavine, one of the primary sponsors of the act, in his remarks before the House of Representatives, clearly contrasted land owned by private individuals with that owned by federal, state and municipal bodies. "We should realize, though, that neither federal, state or local implementation of recreational plans are going to require or set aside enough land for the recreational needs of our citizens. For certain and many types of outdoor activities such as hiking, hunting, fishing, enjoyment of the rural life in Connecticut, we have long depended and will continue to depend upon the generosity of private owners of land and water to open their property to the use and enjoyment of their fellow citizens." 14 H.R. Proc., Pt. 4, 1971 Sess., pp. 1804–1805. Representative Lavine's comments were echoed by sev-

---

[4] Connecticut's statute, like those of many other states, had its genesis in the model act. G. Thompson & M. Dettmer, "Trespassing on the Recreational User Statute," 61 Mich. B.J. 726 (1982). The introductory statement of the reasons for the model act is therefore entitled to consideration. The preamble provides: "Recent years have seen a growing awareness of the need for additional recreational areas to serve the general public. The acquisition and operation of outdoor recreational facilities by governmental units is on the increase. However, large acreages of private land could add to the outdoor recreation resources available. . . . [I]n those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them.

"In something less than one-third of the states, legislation has been enacted limiting the liability of private owners who make their premises available for one or more public recreational uses. This is done on the theory that it is not reasonable to expect such owners to undergo the risks of liability for injury to persons and property attendant upon the use of their land by strangers from whom the accommodating owner receives no compensation or other favor in return.

"The suggested act which follows is designed to encourage availability of private lands . . . ." 24 Council of State Governments, "Public Recreation on Private Lands: Limitations on Liability," Suggested State Legislation (1965) p. 150.

eral other legislators. Senator Romeo Petroni noted that "it is an important bill and . . . it will have I think the positive [e]ffect as far as people who own private lands opening them up for recreation . . . ." 14 S. Proc., Pt. 4, 1971 Sess., p. 1679.

The act helped to make the option of opening private land for public recreational use more viable by decreasing liability to landowners and decreasing costs to governmental entities seeking to provide recreational lands. Absent the exercise of its right of condemnation, the government is powerless to compel private landowners to open their property for recreational use. Moreover, budget deficits limiting governments' ability to invest in recreational lands sufficient to satisfy the ever increasing demand effectively eliminated even this option. The act furnished a solution. "[T]his would open up land in the state of Connecticut at no cost to the state, town or federal government at all." 14 H.R. Proc., Pt. 4, 1971 Sess., p. 1809, remarks of Representative Peter F. Locke, Jr.[5]

As stated, this act sought to increase the availability of recreational lands by limiting liability for accidents occurring on the property. Landowners are protected in two ways from liability for injuries suffered by entrants. When a landowner directly or indirectly invites another to use his property for a recreational purpose without fees, the entrant does not thereby become a licensee or invitee. General Statutes § 52-557g. The landowner "owes no duty of care to keep the land, or the part thereof so made available, safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condi-

---

[5] It was also remarked before the Senate that "this is an important bill. And will probably do more to open up land to recreation purposes without the expenditure of a single penny on the part of the state." 14 S. Proc., Pt. 4, 1971 Sess., p. 1679, remarks of Senator Roger W. Eddy.

tion, use, structure or activity on the land to persons entering for recreational purposes." General Statutes § 52-557g (a). Historically, the common law places a successively greater duty on the landowner to visitors, depending on whether the visitor is a trespasser, a licensee, or an invitee. *Morin* v. *Bell Court Condominium Assn., Inc.,* 223 Conn. 323, 327–28, 612 A.2d 1197 (1992). The act drastically alters these principles. Except where there is consideration; General Statutes § 52-557h; the act fundamentally changes the law by shifting the burden of liability for injuries from the land occupier, who may be in a better position to prevent accidents, to the entrant, regardless of his or her classification at common law, who may be powerless to avoid them. This fundamental change is consistent with the underlying objective of the legislation to encourage free use of land. The act reflects the judgment of the legislature that the public benefit of attracting private landowners to allow their land to be used outweighs the risk of potential injuries.

The inherent costs to society that can result from removing the caretaking responsibilities and duty to warn against known or discoverable hazards imposed upon public landowners at common law, however, are not outweighed by any benefit conferred upon society by the act. Public lands are lands already held open to the public. Accordingly, there is no appreciable benefit derived by cloaking municipalities with this immunity in derogation of the common law.[6] In contrast to the private landowner, the act does not prompt or motivate municipalities to do anything different with their land. There is nothing in the legislative history to suggest that the legislature intended or even contemplated

---

[6] Because immunity conferred by General Statutes § 52-557g is in derogation of the common law, it should be strictly construed to effectuate its intended purpose. *McKinley* v. *Musshorn,* 185 Conn. 616, 621, 441 A.2d 600 (1981).

that the act would provide immunity for governmental entities.[7] Therefore, to apply the act to municipalities imposes too high a societal cost and serves no useful or intelligible purpose.

Finally, there is the contrast to be made between our act and legislation in several states that have explicitly extended their states' recreational use acts to public owners. See footnote 8 of the majority opinion; see also Tenn. Code Ann. § 11-10-102 (1992). In the absence of any express legislative provision covering publicly owned lands, I would refuse to extend the immunity beyond private landowners. See *Hovet* v. *Bagley,* 325 N.W.2d 813 (Minn. 1982); *Goodson* v. *Racine,* 61 Wis. 2d 554, 213 N.W.2d 16 (1973).

The majority is correct when it states that *"Manning* dictates that the defendants here were entitled to immunity from liability pursuant to the act." Because I disagree with *Manning* v. *Barenz,* supra, I dissent.

---

[7] At common law a municipality was generally immune from liability for its tortious acts. *Ryszkiewicz* v. *New Britain,* 193 Conn. 589, 593, 479 A.2d 793 (1984). Its employees had a qualified immunity in the performance of a governmental duty. If an employee misperformed a ministerial act, he was potentially liable; if, however, he misperformed a discretionary act, he was immune from liability subject to three exceptions. *Evon* v. *Andrews,* 211 Conn. 501, 505, 559 A.2d 1131 (1989). General Statutes § 52-557n, enacted as part of tort reform in 1986; Public Acts 1986, No. 86-338, § 13; was "intended, in a general sense, both to codify and to limit municipal liability . . . ." *Sanzone* v. *Board of Police Commissioners,* 219 Conn. 179, 188, 592 A.2d 912 (1991). In 1971, when the act was enacted; Public Acts 1971, No. 249; as well as in 1967, immunity for municipalities was alive and well. Accordingly, there was even less incentive to craft the act in order to grant immunity to an entity that was already protected in order to supplement available recreational land.

We have often stated that we will not assume the legislature enacted legislation that serves no useful purpose. *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 99, 291 A.2d 721 (1971); *Anthony* v. *Administrator,* 158 Conn. 556, 565, 265 A.2d 61 (1969). Furthermore, if a statute is susceptible to an interpretation by which such a consequence can be avoided, that interpretation will be found. *Hartford Electric Light Co.* v. *Water Resources Commission,* supra.

The protection granted through the act was an incentive for private owners to open up new lands for public use. It was not an attempt to provide an immunity shield for existing state or municipal recreational areas. "Stare decisis is not an end in itself. If a decision reflects a public policy that is no longer viable, we should not adhere to a precedent in blind imitation of the past."[8] (Internal quotation marks omitted.) *Curry* v. *Burns,* 225 Conn. 782, 802, 626 A.2d 719 (1993) (*Peters, C. J.,* dissenting); *Brunswick* v. *Inland Wetlands Commission,* 222 Conn. 541, 555, 610 A.2d 1260 (1992).

Accordingly, I would reverse the judgment of the trial court.

---

[8] Although we look to legislative inaction following a decision by this court to signify its acquiescence in our interpretation of a particular section; see, e.g., *Scheyd* v. *Bezrucik,* 205 Conn. 495, 506–507, 535 A.2d 793 (1987); the ink on *Manning* v. *Barenz,* 221 Conn. 256, 603 A.2d 399 (1992), has barely dried. I, therefore, hesitate to draw any conclusion from the lack of legislative response to this court's interpretation of the act.