**Manivald KURISOO, Plaintiff–Appellant,**

v.

**PROVIDENCE & WORCESTER RAILROAD COMPANY, Defendant–Appellee.**

No. 1663, Docket 94–9303.

United States Court of Appeals, Second Circuit.

Argued June 22, 1995.

Decided Oct. 17, 1995.

592

Carmine J. Giuliano, Hartford, CT (Candice Mulak, Fusco & Giuliano, on the brief), for Plaintiff–Appellant.

Howard E. Walker, Providence, RI (Thomas J. Shortell, Kerry R. Callahan, Jennifer A. Osowiecki, Updike, Kelly & Spellacy, Hartford, CT, Hinckley, Allen & Snyder, Providence, RI, on the brief), for Defendant–Appellee.

Before KEARSE, ALTIMARI, and PARKER, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Manivald Kurisoo appeals from a judgment of the United States District Court for the District of Connecticut, Alfred V. Covello, *Judge*, dismissing Kurisoo's complaint seeking damages from defendant Providence & Worcester Railroad Company ("P & W") for personal injury. resulting from P & W's alleged negligence in the maintenance of its property. The district court granted summary judgment dismissing Kurisoo's claims on the ground that P & W was immune from liability under Connecticut's "recreational use" statute, Conn.Gen.Stat. §§ 52–557f to 52–557i (1991). On appeal, Kurisoo contends that there were genuine issues to be tried as to (a) whether the P & W-owned area where he was injured was "available to the public," a statutory prerequisite for recreational-use immunity, and (b) whether P & W's conduct was "wilful or malicious" and hence within a statutory exception from the grant of such immunity. For the reasons below, we reject Kurisoo's contentions and affirm the judgment of the district court.

## I. BACKGROUND

P & W owns a railroad right-of-way extending for several miles along the Thames River between Groton and Norwich, Connecticut. On October 2, 1991, Kurisoo was fishing at a popular fishing area located on P & W property (the "P & W fishing area") when a passing train collided with a rock and caused the rock to strike Kurisoo, severely injuring his leg. Thereafter, Kurisoo underwent numerous surgical procedures, culminating in amputation below the knee. The pertinent facts with regard to P & W's operation of its right-of-way are not in dispute.

### A. *The Circumstances Surrounding the Injury*

The P & W fishing area was widely known as an excellent location for fishing and had received publicity as such in at least two local newspapers. The public gained access to the right-of-way by crossing a parking lot near a state highway and following a steep path

along the river bank. In his pretrial deposition, Kurisoo stated that the site of the accident was often crowded with fishermen and that "[e]verybody fish[ed] there." (Kurisoo Dep. at 6.)

There were no signs prohibiting trespassing either at the parking lot or along the path Kurisoo and other fishermen used to reach the P & W fishing area. Nor were there any such signs at the fishing area. The "No Trespassing" signs nearest to the site of Kurisoo's accident were approximately 700 feet to the south of the access path, and approximately 750 feet south of the fishing area itself, near a cluster of private homes that abutted the right-of-way. In addition, "No Trespassing" signs were posted on a narrow railroad bridge one mile north of the P & W fishing area. While members of the public had been asked by P & W employees to leave the bridge, P & W had never made any attempt to restrict fishermen's access to the right-of-way generally or to the P & W fishing area.

Kurisoo stated that after his retirement in 1986, he fished at the P & W fishing area about five times a week. During that time no one ever told him not to fish there; nor did he see anyone ejected from the area for any reason. He testified that about an hour before a train passed, a P & W employee customarily drove along the tracks in a specially equipped truck, warned anyone nearby of the train's approach, and indicated its current location and likely time of arrival. On no occasion did the employee either order fishermen to leave the property or indicate that fishing there was forbidden.

Many fishermen at the site regularly propped their fishing poles against one of the railroad tracks, using a rock to lodge the pole against the rail. Kurisoo testified that he always gave the rocks a wide berth "[b]ecause you never know what happen [sic]." (Kurisoo Dep. at 58.) Several P & W employees gave deposition testimony concerning P & W's knowledge that fishermen were using rocks to lodge their fishing poles against the railroad tracks. Under federal regulations, P & W was required to make weekly inspections of its tracks to keep them clear of debris, and on numerous occasions P & W inspectors and other employees removed rocks found on the tracks. Frank Benson, a P & W maintenance supervisor, stated that on several occasions over a ten-year period he had sent crews of between one and four men to clear away rocks near the tracks. Further, P & W track inspector Franklin Fifield stated that he had removed rocks from the tracks near the P & W fishing area more than 15 times in the previous several years, and that he had told fishermen not to leave rocks in the tracks "[f]or safety reasons."

The record contains no evidence of any injuries or other accidents resulting from rocks laid on the tracks prior to Kurisoo's injury. One P & W employee, a trainman for 10 years, had no recollection of his train ever hitting a rock on the tracks; another employee, a track inspector, testified that he had never seen a train hit anything on the tracks. Kurisoo also testified that he had never seen a train hit a rock or injure any other fisherman.

### B. *The Proceedings in the District Court*

Kurisoo commenced this diversity action in September 1993, contending that P & W and its agents had been negligent in, *inter alia,* operating the train that caused Kurisoo's injury and carrying out their duty to keep the track clear of debris. Discovery was conducted through interrogatories, document production, the depositions of five P & W employees, and the deposition of Kurisoo.

Following the completion of discovery, P & W moved for summary judgment dismissing the complaint on the ground that Kurisoo's claims were barred under § 52–557g of the Connecticut recreational-use statute. As discussed in Part II below, that statute provides that, subject to certain exceptions, to the extent that a landowner makes his land available to the public free of charge for recreational purposes, he owes no duty of care to recreational users. Kurisoo opposed summary judgment, contending that there were factual issues to be tried as to the applicability of the statutory immunity. First, pointing out that there were "No Trespassing" signs 700+ feet from the fishing area, he argued that P & W did not meet the statutory

prerequisite for recreational-use immunity because it had not made the land available to the public. Second, stating that he had never been warned by any signs or any P & W employee of any danger, he argued that even if the fishing area was available to the public, P & W had no statutory immunity because § 52–557h provides that § 52–557g does not apply to conduct that is willful or malicious.

In a Ruling on Defendant's Motion for Summary Judgment dated September 9, 1994 ("District Court Opinion"), the district court granted P & W's motion. The court noted that it was undisputed that (1) P & W had made no attempt to restrict the public's access to the fishing area, (2) there were no "No Trespassing" signs in the fishing area, nor were there any such signs along the path fishermen used to reach the area, and (3) the nearest "No Trespassing" sign was more than 700 feet away. *See* District Court Opinion at 9 & n. 5. Noting that § 52–557g granted an owner recreational-use immunity with respect to "any part of the land" made available to the public, the court reasoned that the posting of "No Trespassing" signs on one part of the property would not necessarily deprive P & W of immunity with respect to another part. The court concluded that the "No Trespassing" signs that had been posted could not reasonably be found to prohibit public use of the fishing area 700 feet or more away. The court also held that P & W's failure to warn Kurisoo of the dangers of fishing at the site could not be found willful or malicious, stating that "[t]here is no evidence that the defendant had superior knowledge of any dangers which may have ultimately harmed the plaintiff" or "that the defendant intentionally caused injury to [him]." District Court Opinion at 10.

Following the entry of judgment, Kurisoo moved for reconsideration, contending that P & W did have "superior knowledge" of the dangers posed by rocks left near the railroad tracks. In support of this contention, Kurisoo pointed to the deposition testimony of P & W employees indicating (1) that they considered fishermen's practice of putting rocks near the rails a problem that could increase the risk of a train derailment, (2) that fisher-

men were told not to leave rocks near the tracks for safety reasons, and (3) that P & W repeatedly dispatched crews to remove such rocks. In an endorsed order dated November 15, 1994, the court rejected Kurisoo's contention and adhered to its original ruling, concluding that P & W's conduct "did not rise to the level of a '[w]ilful or malicious failure to guard or warn'" within the meaning of § 52–557h. This appeal followed.

## II. DISCUSSION

On appeal, Kurisoo argues principally that the presence of "No Trespassing" signs posted by P & W created a genuine issue to be tried as to whether P & W imposed "an *absolute blanket prohibition* ... [as to] the entirety of the [P & W] property" (Kurisoo brief on appeal at 17 (emphasis in original)). He also contends that there were issues of fact to be tried as to whether P & W's conduct was willful and malicious. Viewing the record in the light most favorable to Kurisoo, and drawing all reasonable inferences in his favor, *see, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), we find his contentions unpersuasive.

### A. *Availability for Public Use*

Section 52–557g of the Connecticut recreational-use statute provides, in pertinent part, as follows:

(a) Except as provided in section 52–557h, an owner of land who makes all or any part of the land available to the public without charge, rent, fee or other commercial service for recreational purposes owes no duty of care to keep the land, or the part thereof so made available, safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on the land to persons entering for recreational purposes.

(b) Except as provided in section 52–557h, an owner of land who, either directly or indirectly, invites or permits without charge, rent, fee or other commercial ser-

vice any person to use the land or part thereof, for recreational purposes does not thereby: (1) Make any representation that the premises are safe for any purpose; (2) confer upon the person who enters or uses the land for recreational purposes the legal status of an invitee or licensee to whom a duty of care is owed; or (3) assume responsibility for or incur liability for any injury to person or property caused by an act or omission of the owner.

Conn.Gen.Stat. §§ 52–557g(a) and (b). Section 52–557h provides, *inter alia*, that "[n]othing in [§ 52–557g] limits in any way the liability of any owner of land which otherwise exists: (1) For wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity...." *Id.* § 52–557h. Reviewing the legislative history of this statute, the Connecticut courts have observed that the

> clear purpose of § 52–557g is an attempt to satisfy the public's need for recreational and open space by encouraging private land owners, through limiting their liability, to open their land to public use. The government alone cannot meet this need. "[W]e have long depended and will continue to depend upon the generosity of private owners of land and water to open their property to the use and enjoyment of their fellow citizens.... So this act here is to allow limited liability ... of Connecticut property owners to open their land for public use without charge." 13 H.R.Proc., Pt. 4, 1971 Sess., p. 1805 (remarks of Rep. David Lavine).

*Genco v. Connecticut Light & Power Co.,* 7 Conn.App. 164, 168–69, 508 A.2d 58, 61 (1986) ("*Genco*"); *see Scrapchansky v. Town of Plainfield,* 226 Conn. 446, 452–53, 627 A.2d 1329, 1332–33 (1993) ("the purpose of the act is to make land accessible for recreational use by the public").

■■■ Section 52–557g(a) states explicitly that a landowner may open "any part of the land" to recreational use by the public and thereby limit its liability for "the part ... so made available." In *Genco,* the defendant owner of Candlewood Lake had posted signs restricting use in certain locations on the lake; but it submitted affidavits establishing that the lake was otherwise available to the public for many recreational uses. The plaintiff's injury occurred in a part of the lake that was not posted as restricted, and the Connecticut Appellate Court affirmed the granting of summary judgment in favor of the defendant, stating that "signs posted by the defendant restricting use in certain locations on the lake" other than where the plaintiff was injured "do not put a material fact in issue" with respect to the area in which the plaintiff was injured. *Genco,* 7 Conn.App. at 168, 508 A.2d at 61; *see also id.* at 167, 508 A.2d at 60 (describing summary judgment principles paralleling those applicable in federal court).

For the court to hold that the plaintiff's accident "falls outside the statute would have the effect of discouraging landowners from opening their lands for any public use free of charge. It would require that a landowner either open up his land for *all* purposes, or greatly increase the number of security personnel to ensure that only permitted uses occur in order to secure the protection of the statute."

*Id.* at 169, 508 A.2d at 61 (quoting *Jennett v. United States,* 597 F.Supp. 110, 113 (D.Conn. 1984) (emphasis in *Jennett*)). Thus, notwithstanding the fact that a landowner has forbidden the public to use some areas of his property, areas not restricted may be considered "available to the public" within the meaning of § 52–557g. *See also Scrapchansky v. Town of Plainfield,* 226 Conn. at 452–53, 627 A.2d at 1332–33 (high school baseball field held "available to the public" despite owner's limitation of public use to certain times and its requirement that users obtain advance permission).

In the present case, there is no dispute as to the facts regarding the public's use of the P & W fishing area. No "No Trespassing" signs were posted in the area; the nearest such signs were approximately 700 feet away, *i.e.,* a distance greater than two football fields laid end-to-end. The closest spot from which P & W had asked members of the public to leave was the railroad bridge, a mile away. There were no "No Trespassing" signs on the pathway by which fishermen gained access to the P & W fishing area, and

the area had been used freely and openly for fishing by members of the public for many years without any attempt by P & W to restrict such use. Indeed, the availability of the P & W fishing area to the public was publicized through articles in local newspapers touting the area as affording excellent fishing. The area was, according to Kurisoo himself, often crowded with fishermen, for "[e]verybody fish[ed] there." There can be no dispute as to P & W's awareness of the public use of the area; Kurisoo testified that P & W employees customarily came by to warn the fishermen when a train was coming. We see no error in the district court's conclusion that the posting of signs some 700 feet away and the requests that members of the public leave the railroad bridge a mile away were insufficient to create a genuine issue to be tried as to the availability for public use of the fishing area where Kurisoo was injured.

### B. *"Wilful or Malicious" Conduct*

Nor do we find merit in Kurisoo's contention that, even if the P & W fishing area was available for public use, there is a genuine issue to be tried as to whether P & W's failure to warn him of the hazards posed by rocks left near the railroad tracks was "wilful or malicious" within the meaning of § 52–557h. As interpreted by the Connecticut courts, that standard is one that the record reveals Kurisoo cannot meet.

In the context of tort actions brought under Connecticut common law, the phrase "wilful or malicious" has generally been interpreted in terms that are virtually indistinguishable from the prevailing common-law definition of "intentional" conduct:

A wilful and malicious injury is one inflicted intentionally without just cause or excuse.... Not only the action producing the injury but the resulting injury must be intentional.... A wilful or malicious injury is one caused by design. Wilfulness and malice alike import intent.... [The] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances.

*Markey v. Santangelo*, 195 Conn. 76, 77–78, 485 A.2d 1305, 1307 (1985) (internal quotation marks omitted, brackets ours); *see Sharkey v. Skilton*, 83 Conn. 503, 507–08, 77 A. 950, 951 (1910). Thus, in order to prove that an act was willful and malicious, the plaintiff must show either that the actor intended to cause the harm or that the harm was the direct and natural consequence of his or her intended act. *Markey v. Santangelo*, 195 Conn. at 77–78, 485 A.2d at 1307. That is, there must be a "substantial certainty" that the harm will result from the conduct, a "substantial certainty" being more than merely a foreseeable risk and more than even a " 'strong probability.' " *Mingachos v. CBS, Inc.*, 196 Conn. 91, 103, 491 A.2d 368, 376 (1985) (quoting 3 Restatement (Second) of Torts § 500, cmt. f (1965)).

While the precise meaning of "wilful or malicious" under § 52–557h has not been addressed by the Connecticut Supreme Court, it appears that the common-law interpretation would be applied. One lower Connecticut court has so held, ruling that a landowner's failure to warn the public of a hazardous rope swing would not restrict his recreational-use immunity unless he "knew of the existence of the rope swing, knew with relative certainty that it was dangerous, *and intended for an injury to occur* by failing to post a warning." *Lopes v. Post*, 1994 WL 110004, at *4 (Conn.Super.Ct. March 16, 1994) (emphasis added). And the Connecticut Supreme Court has applied the common-law definition of willfulness to a similarly worded statute granting a landowner immunity with respect to any injury sustained by operators of certain types of motorized vehicles on his property unless the injury is caused by the landowner's "wilful or malicious conduct," Conn.Gen.Stat. § 52–557j. *See Warner v. Leslie–Elliott Constructors, Inc.*, 194 Conn. 129, 138, 479 A.2d 231, 237 (1984) (citing *DeMilo v. City of West Haven*, 189 Conn. 671, 678, 458 A.2d 362, 366 (1983) (claim under Conn.Gen.Stat. § 52–566 that the defendant "wilfully remove[d] or destroy[ed]" part of a bridge required proof either that the defendant "not only intentionally removed or destroyed a bridge, but that he intended to cause an injury as a result or acted with reckless disregard as to whether an injury would result")).

Applying this standard to the present case, we see no evidence in the record from which a rational juror could infer that P & W's maintenance of its tracks or its failure to warn Kurisoo was "wilful or malicious." The record provides no support for Kurisoo's suggestion that P & W knew or should have known that the rocks left on the tracks were "substantially certain" to result in injury to users of the fishing area. To the contrary, no one could recall that such an injury had ever occurred prior to Kurisoo's accident; hence there was no such substantial certainty. Nor does the record permit an inference that P & W intended either that rocks remain against the railroad tracks or that anyone be injured. Rather, it is undisputed that P & W frequently removed rocks from the tracks, told fishermen not to put rocks against the tracks, and regularly warned fishermen about approaching trains. We conclude that Kurisoo presented no evidence from which a rational juror could infer that the conduct of P & W was "wilful or malicious." Summary judgment was properly granted.

## CONCLUSION

We have considered all of Kurisoo's contentions on this appeal and have found them to be without merit. The judgment of the district court is affirmed.