[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
These consolidated cases arise out of the termination of the employment of the plaintiff Cynthia Ryan by the City of Waterbury (the "City") for alleged misappropriations of funds. Her claims are set forth in a four count complaint which alleges breach of an implied employment contract, intentional infliction of emotional distress, negligent infliction of emotional distress and bad faith breach of an implied employment contract. The City in its answer denied the material allegations of the complaint and pleaded a special defense, that the City is immune when performing discretionary government functions, and a setoff. Ryan failed to brief her two emotional distress counts and they are therefore deemed abandoned. Collins v. Goldberg,28 Conn. App. 733, 738 (1992). The City failed to brief its special defense and its setoff and they too are deemed abandoned. Id.
The City's claims against Ryan are also set forth in a four count complaint. The City alleges breach of Ryan's fiduciary duty, breach of her duty of good faith and fair dealing, a civil CT Page 11939 RICO claim under 18 U.S.C. § 1961 et seq. and conversion. In addition to denying the material allegations of the complaint, Ryan in her answer alleged three special defenses: waiver, estoppel and expiration of the statute of limitations. The City failed to brief its fiduciary duty and good faith and fair dealing counts and they are deemed abandoned. Id. The City makes one reference in its initial brief to the conversion claim, but fails to address the claim in any detail with reference to supporting evidence or law. A claim which is given only cursory attention in a brief without substantive discussion or citation of authorities is deemed to be abandoned. State v. Sewell,38 Conn. App. 20, 28 (1955). Analysis is required in order to avoid abandoning an issue by failing to brief it properly. Cummings v.Twin Tool Manufacturing Co., 40 Conn. App. 36, 45 (1996). The court therefore finds that the City abandoned its conversion claim also. Ryan failed to brief any of her special defenses and they are all deemed abandoned.
Both these cases were consolidated and tried to the court. Part I of this decision addresses Ryan's remaining claims in the suit brought by her. Part II addresses the City's civil RICO claim in its suit against Ryan.
The court finds the facts as hereafter set forth. In early 1989, the plaintiff was employed by the City as Deputy Director for Operations of an agency known as the Department of Employment, Education and Grants Administration ("DEEGA"). DEEGA, funded largely by federal grants, offered a variety of programs to train unemployed workers so that they could become reemployed. A major part of DEEGA's funding was from the federal Job Training Partnership Act ("JTPA"). JTPA funds are provided by grant from the federal government to the state labor department and from the state labor department to local municipal agencies including DEEGA.
The plaintiff began her employment with the City in 1976, shortly after graduating from college. She started as a counselor in an agency which was a predecessor of DEEGA. She advanced through promotions. In 1983, after earning a masters' degree in public administration, she was employed by the Waterbury Area Job Training Administration ("WAJTA"), DEEGA's immediate predecessor. She was promoted to deputy director of operations of DEEGA in 1987. She was one of two managers who reported directly to Joseph Carrah, the administrator of DEEGA, who was in overall charge of operations. Carrah reported to Mayor Joseph Santopietro because CT Page 11940 DEEGA operated as a part of the mayor's office. Ryan managed the programmatic operations of DEEGA; John Bolinski, the other deputy director, was in charge of the fiscal operations.
DEEGA employed approximately twenty-five people in 1989. In late June, 1989, Carrah changed the organizational structure of DEEGA, making Ryan the Director of DEEGA, in charge of the overall supervision of the day-to-day operations of the entire agency.
The event which ultimately led to Ryan's firing was her acceptance of two bonuses late in 1989. On October 6, 1989, Ryan accepted a bonus check for $2000 which was signed by both Carrah and Santopietro. In early December, Ryan accepted a second bonus check, this one for $5,000, which was dated December 6, 1989 and signed by Carrah. Carrah gave the plaintiff this check in an envelope which contained a note from Carrah thanking the plaintiff for her dedication and leadership in her work for DEEGA. Carrah, Bolinski and a fourth management employee, Pierre Chabot, also received two bonuses.
The plaintiff was suspended with pay from her employment with DEEGA on December 28, 1990 because of her acceptance of the two bonus checks. Payment of the bonuses had been discovered by the Director of State JTPA Administration, who recommended that Mayor Santopietro suspend all four employees for the improper use of JTPA funds. Ryan's "Loudermill" pretermination hearing was held on February 8, 1991 and on February 15, 1991, Santopietro terminated the plaintiff's employment with DEEGA in accordance with the recommendation of the hearing officer. The hearing officer found that the plaintiff failed to act as a prudent manager in that she knew or should have known that the bonus payments were improper and should have questioned those payments.
 I
The plaintiff claims that she was wrongfully discharged from her employment with DEEGA in violation of an implied contract for long term employment. The City disputes this claim on both the facts and the law.
Statements in an employer's personnel manual may give rise to an express or implied contract between employer and employee.Finley v. Aetna Life Casualty Co., 202 Conn. 190, 198 (1987). To prevail on a claim of implied agreement between employer and CT Page 11941 employee, the plaintiff must prove by a preponderance of the evidence that the employer undertook a commitment to the employee that he could not be terminated without just cause. Coelho v.Posi-Seal International, Inc., 208 Conn. 106, 112 (1988). The evidence provided by the plaintiff at trial readily met this standard.
Shortly after she was hired by WAJTA in 1983, Ryan was given a copy of the agency's personnel policies and was required to sign a receipt for the policies. The policies contain a provision for a probationary period in order to evaluate an employee's work "in order to determine fitness for permanent status in the position." (Emphasis added.) Chapter 13 of the policies, entitled "Disciplinary Actions," enumerates twelve different types of conduct which "shall be sufficient cause for disciplinary action." Section 13-2.D. of the policies further provides:
 DISMISSAL — The WAJTA Director may terminate an employee. The employee must be given a written notice specifying the effective date of the termination, the charge the specific behavior and the dates (where appropriate) that support the charge, any circumstances affecting the severity of the discipline, and advice on right of appeal. (See Chapter 14).
(Emphasis added.)
In 1989, DEEGA adopted new personnel policies for management alone. These policies, which bear the signatures of Carrah and Santopietro, became effective October 1, 1989. At trial the City called Santopietro as a witness. He testified that he did not approve these management personnel policies and that he was unsure whether it is his signature which appears on those policies. The court did not find that Santopietro's testimony was credible. He is a convicted felon with an obvious incentive to distance himself from any financial improprieties at DEEGA because he is facing a civil suit by the City to recover hundreds of thousands of dollars in misappropriated funds. The court finds that the management personnel policies were indeed signed by Santopietro as mayor of the City.
These policies also provide for a probationary period before appointment to a "permanent" position, and list twelve types of conduct which are to be considered "sufficient cause for CT Page 11942 disciplinary action." The policies further state that "[t]he Administrator may utilize any of the following options at any time or a combination thereof to fulfill disciplinary actions: Oral reprimand, written reprimand, suspension, probation, or dismissal."
The cited provisions of both policies establish that the plaintiff's employment was not terminable at will. Both personnel policies established that the plaintiff's "permanent" employment at DEEGA could be terminated only for sufficient cause as set forth in the policies. This was clearly the intention of the City as manifested by the words and provisions which were incorporated into both sets of policies. The City undertook a contractual commitment to the plaintiff that she could not be terminated without sufficient cause.
The City contends that as a municipal employee, the plaintiff cannot rely on a personnel manual to create an implied contract, citing Fennell v. City of Hartford, 238 Conn. 809 (1996). The plaintiffs in Fennell were retired police officers seeking damages for the City's failure to pay certain retirement benefits. They claimed breach of an implied contract based on certain statements contained in a pension manual issued by the city pension commission. The Supreme Court held that implied contract principles could not be applied to representations in the pension manual because the pension commission did not have the legal authority to confer additional pension benefits through the manual. Id., 816-17. Under the city charter, said the court, the city council had the sole authority to confer pension benefits and the manual would have to be ratified by the council in order to bind the city. Id. Without ratification, the court ruled, the manual could not serve as the basis for the plaintiffs' implied contract claim.
Although Fennell appears at first blush to be possibly applicable to the present case, there is a fundamental distinction between the cases. Under the Hartford City Charter, the pension commission did not have the legal authority to confer pension benefits and this is the key basis for the decision. As the court states, "Our holding today is premised on the fact that the city council had the sole authority to grant additional pension benefits. Even if the pension manual clearly provided for such a benefit, the commission was not empowered to confer additional benefits." Id., 819, n. 8. CT Page 11943
In the present case the Waterbury City Charter provides in Section 306 that the board of aldermen shall not have any authority over city employees. Section 2102 (e) provides the mayor with the power
 [t]o control and supervise all officers and departments of the city or town and to that end shall have power to make and enforce such rules and regulations as he may deem advisable for and concerning the organization management and operation of all the offices and departments and the agencies which may be created for the administration of its affairs, and, within the limits of appropriations, to have power to fix the numbers and kinds of offices and positions and the rates of compensation for all officers and employees, except as otherwise provided.
(Emphasis added.) Former Mayor Edward Bergin testified at trial that he approved and signed the WAJTA personnel policies pursuant to his authority as mayor under Section 2102 (e) of the charter. Because Bergin and Santopietro had the legal authority under the charter as mayor to issue and/or approve the personnel policies on behalf of the City, unlike the pension commission in Fennell, the plaintiff in this case can properly rely on the provisions of the personnel policies for her implied contract claim.
The next issue is whether the City had sufficient cause to terminate the plaintiff's employment as it did in February, 1991. The February 15, 1991 letter which the plaintiff received notifying her of the termination of her employment stated that the termination was pursuant to the recommendation of the hearing officer. A copy of the hearing officer's recommendation was enclosed in the letter. The recommendation to terminate was based on the finding that the plaintiff, as Director of DEEGA, knew or should have known that payment of the bonuses was improper.
There was no evidence at trial that the plaintiff had any actual knowledge of the impropriety of the bonuses. The more difficult question is whether the plaintiff as a prudent manager of DEEGA should have known of the impropriety of the bonuses. This requires an examination of all the circumstances surrounding the payment of the bonuses.
The plaintiff's first bonus of $2000 was paid by a DEEGA CT Page 11944 check dated October 6, 1989, which was signed by both Carrah and Santopietro. Throughout 1989, the plaintiff and others at DEEGA worked hundreds of hours of uncompensated overtime at night and on weekends. In late 1988 Santopietro had designated DEEGA to be the sole City agency to apply for government grants because of DEEGA's past success in obtaining such grants. The workload of the agency therefore increased significantly, causing the plaintiff and others to work a substantial amount of unpaid overtime. In addition, just prior to receipt of the October bonus, the City was notified that it was a finalist for a grant from the prestigious Robert Wood Johnson Foundation. This was a special achievement resulting from the hard work of the plaintiff and others at DEEGA. The plaintiff testified that she received the bonus only a few days after she and other DEEGA employees were honored at the mayor's office for their work on the Johnson grant application. Under these circumstances, the court cannot find that the plaintiff should have known of the impropriety of the first bonus.
The second bonus, for $5000., was paid to the plaintiff by a check dated December 6, 1989 drawn on a DEEGA account entitled "Stewart McKinney Grant." This grant, which was for the purpose of providing job training to the homeless, had been applied for and awarded in the fall of 1989. Grant funds became available for the first time in December, 1989. Ryan supervised the preparation of the grant application and drafted the narrative portion of the application, as she did for so many grant applications.
The plaintiff received the second bonus when she was called to Carrah's office and he handed her an envelope. Carrah told Ryan it was a bonus because the agency had had such a successful year. Carrah also gave her an envelope with a bonus for Chabot. Ryan opened her envelope when she was back in her own office and found the $5000 check together with a thank you note from Carrah. At the end of the note was a "P.S.," which read "Paula [Carrah's secretary] also gave you the $100. bonus — she is not aware of this one. Enjoy!" The note referred to the $100 bonuses which Carrah had given to all DEEGA employees, including the four management employees.
The plaintiff testified that she did not notice that the check was drawn on the McKinney grant account and that she did not know whether the McKinney grant permitted grant funds to be paid as bonuses. She further testified that she thought this bonus was deserved and she did not see anything wrong in CT Page 11945 accepting it. The court did not find this portion of the plaintiff's testimony credible.
The plaintiff testified at length during the trial, giving the court a full opportunity to observe her and evaluate her testimony. Many of the exhibits admitted into evidence at trial were memos which the plaintiff had drafted. Many of the witnesses at trial were fellow DEEGA employees of the plaintiff's who testified about her and her actions. Based on all of this evidence, the court found the plaintiff to be an intelligent, professional, responsible and organized person. She is conscientious, meticulous and detail-oriented, the type of person who would notice the account on which a $5000. check was drawn, especially when it was a new account recently opened for a newly received federal grant. She is further the type of person who would remember that a grant application prepared only several weeks earlier did not permit grant funds to be paid as bonuses to employees. The court finds that Ryan saw that the check was drawn on the McKinney account and that she knew that the McKinney grant did not provide for bonuses to be paid with grant funds.
Additional circumstances surrounding the payment of the second bonus also demonstrate that the plaintiff should have known that the bonus was not proper. The plaintiff was presented the second bonus only sixty days after receiving the $2000. bonus, the first in her thirteen-year career as a municipal employee. Moreover, the second bonus was in an amount two and one-half times the size of the first bonus and equal to about ten percent of her annual salary. The note which accompanied the check informed her that Paula Kulmann, Carrah's secretary, was not aware of this large bonus. This should have seemed unusual to the plaintiff because Kulmann was responsible for preparing the weekly DEEGA payroll for submission to the City. DEEGA employees were paid by payroll checks from the City of Waterbury. The $5000. check clearly was not a City of Waterbury payroll check; it was a DEEGA check drawn on a grant account and had none of the normal deductions for withholding taxes and similar items. In a thirteen-year career as a municipal employee the plaintiff had only received one bonus. Now, only sixty days after the first bonus, she was presented with a much larger second bonus given to her in a sealed envelope without the knowledge of the DEEGA employee who customarily prepared the DEEGA payroll. The court finds based on the evidence presented and the lack of credibility of this portion of the plaintiff's testimony that the plaintiff had reason to know that the $5000 bonus that she received in CT Page 11946 December 1989 was allegedly improper.
Both the WAJTA personnel policies in effect when the plaintiff joined WAJTA in 1983 and the DEEGA management personnel policies implemented by Carrah in October 1989 set forth virtually the same grounds as sufficient cause for disciplinary action. Neither the hearing officer who recommended the plaintiff's discharge nor Santopietro, who actually terminated the plaintiff's employment, identified any specific ground of sufficient cause as set forth in the personnel policies. The grounds which might be considered applicable are as follows:
 Wilful misuse, appropriation, negligence or destruction of Administration property.
 Criminal, dishonest or other unsuitable conduct which interferes with effective job performance or has an adverse effect on the efficiency of the Administration's service.
 Any other conduct or action of such seriousness that disciplinary action is considered warranted.
The Connecticut Supreme Court has defined wilful misconduct as "intentional conduct designed to injure for which there is no just cause or excuse." Dubay v. Irish, 207 Conn. 518, 533 (1988). Our Appellate Court has described wilful misconduct as intentional misconduct "done purposely with knowledge, or misconduct of such a character as to evince a reckless disregard of consequences . . ." Greene v. Metals Selling Corporation,3 Conn. App. 40, 44 (1984). "`Wilful' implies bad purpose, wantonness and reckless indifference." Lazarcheck v.Administrator, Unemployment Compensation Act, 1 Conn. App. 591,594 (1984).
The court finds that the plaintiff acted wilfully in that she acted with reckless indifference to the propriety of the $5000 bonus by accepting it without question under circumstances such that she should have known of its impropriety or questioned its propriety. Her conduct in this regard as Director of DEEGA was serious and unsuitable and constituted sufficient cause for termination of her employment as Director of DEEGA. Judgment is therefore entered for the defendant City on the plaintiff's complaint. CT Page 11947
 II
In the RICO claim against Ryan, the City alleges that she conspired with Carrah, Bolinski, Chabot, Santopietro and others to deprive the City of certain grant funds entrusted to the City. The City alleges that Ryan and her alleged co-conspirators defrauded the City of public funds in numerous alleged respects, which constituted a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (c) (d).
Five elements must be shown in order to establish a RICO claim: (1) the existence of an "enterprise", (2) that the enterprise affected interstate commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that she participated, even indirectly, in the affairs of the enterprise; and (5) that she participated through a "pattern of racketeering activity." Martin-Trigona v. Smith, 712 F.2d 1421, 1426 and n. 6 (D.C. Cir. 1983). A "pattern of racketeering activity" is defined in 18 U.S.C. § 1961 as including as least two "predicate acts" of racketeering activity. 18 U.S.C. § 1961 (1) (B) defines "racketeering activity" as any act for which an indictment can be brought under specified sections of the United States Code. Among the specified sections are 18 U.S.C. § 1952, concerning interstate and foreign travel, and 18 U.S.C. § 1956, concerning money laundering.
The City claims that Ryan's acceptance of the December bonuses is a predicate act of racketeering under 18 U.S.C. § 1956
(a), which makes liable a person who
 knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . .
(Emphasis added.) This section requires actual knowledge that the property involved represents the proceeds of some unlawful activity as well as the specific intent to "promote the carrying on of specified unlawful activity." As noted before, the City failed to present at trial any evidence of actual knowledge by Ryan of the impropriety of the bonuses or of any other conduct by her at DEEGA. The City therefore failed to establish the CT Page 11948 knowledge and intent required to establish a predicate act of racketeering under 18 U.S.C. § 1956.
The City also contends that Ryan's acceptance of a deferred compensation account constitutes a predicate act of racketeering under 18 U.S.C. § 1956. Once again, however, the City fails to point to any evidence from the trial that Ryan knew of the allegedly unlawful activity and acted with the intent to promote such activity, two of the elements required under 18 U.S.C. § 1956.
The City also claims that Ryan's attendance at a conference in Colorado is a predicate act of racketeering under 18 U.S.C. § 1952. Ryan attended the conference with Pierre Chabot, who took his mother along as a last minute replacement for Carrah. Chabot later improperly obtained reimbursement from DEEGA for his mother's traveling expenses as well as his own.
 18 U.S.C. § 1952 (a) makes liable a person who travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce . . . with intent to . . . promote, manage, establish, carry on or facilitate the promotion . . . of any unlawful activity . . .
(Emphasis added.) This section clearly requires actual intent to assist or facilitate unlawful activity. The City failed to present any evidence at trial, however, that Ryan was aware of Chabot's improper conduct with respect to reimbursement for his mother's expenses for the trip or that she took the trip with the intent to participate in unlawful activity. The City therefore failed to establish the intent required for a predicate act of racketeering under 18 U.S.C. § 1952 (a).
Although the City alleged twenty-two predicate acts of racketeering in its complaint, it briefed only the three acts addressed above. The City's failure to brief the remaining acts alleged in the complaint constitutes abandonment of those claims.Collins v. Goldberg, supra, 28 Conn. App. 738. The City therefore failed to sustain its burden on its RICO claim. Judgment is entered for the defendant Ryan on the City's complaint.
VERTEFEUILLE, J. CT Page 11949